No. 79,835

STATE OF KANSAS, *Appellee,* v. JOHN W. REXROAT, *Appellant.*

(966 P.2d 666)

Opin-
ion filed October 30, 1998.

*Thomas B. Frost,* of Topeka, argued the cause, and was on the brief for appellant.

*James A. Brown,* assistant district attorney, argued the cause, *Joan M. Hamilton,* district attorney, and *Carla J. Stovall,* attorney general, were on the brief with him for appellee.

The opinion of the court was delivered by

LARSON, J.: John W. Rexroat appeals his conviction for possession of methamphetamine, contending the search he was subject to should have been limited to a search for weapons and was therefore unconstitutionally exceeded in violation of *Terry v. Ohio*, 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968).

This appeal raises the first impression issue in Kansas of the application of the Fourth Amendment to the United States Constitution to the search of an individual passing through the security checkpoint upon entry into a courthouse.

*Factual Statement*

On April 9, 1997, Shawnee County Sheriff's Deputy Kermit J. Crane was working at the security station in the Shawnee County Courthouse. While Deputy Crane was on duty, Rexroat entered the courthouse to meet with his probation officer. All persons entering the courthouse are required to pass through a metal detector. When Rexroat passed through the metal detector, it reacted with a tone indicating to Deputy Crane there was "the presence of something metallic on his person or in his immediate presence." Rexroat explained to the Deputy that he was "wearing steel-toed boots." Deputy Crane then utilized a hand-held metal detector "in order to check and verify that was where the metal was; down around his feet." Deputy Crane then ran the metal detector around the outside of Rexroat's clothing. Deputy Crane testified:

> "I ran it across, initially, his left arm and received a tone. He just automatically pulled his sleeve up and revealed a wristwatch, so then I continued on down his body, and towards the left pocket of the sweatshirt that he was wearing, I received another tone. At that point, he put his hand into the pocket and pulled out something. I don't recall what it was; something that didn't seem metallic, but he did pull something out and put it in the tray. I checked again, and this time I again received the same tone. When I indicated that there must be something yet that was metallic, he, instead of reaching in his pocket, he just took the whole sweatshirt off and dropped it on the floor."

After Rexroat removed his sweatshirt, Deputy Crane again ran the metal detector over his body and received no indications of metal other than around Rexroat's feet. Deputy Crane then picked

up the sweatshirt and ran the metal detector over it. He received a tone near the left pocket. He then squeezed the pocket and felt "a hard cylindrical object" inside the pocket and removed it. The object was a 35-millimeter film canister. Deputy Crane "popped the top on the canister and looked inside. . . . I felt like that I knew probably what was in that film can due to the fact that it's common to carry controlled substances in a film can." Deputy Crane discovered a baggie containing white powder inside the canister and arrested Rexroat. The contents of the canister tested positive for methamphetamine.

Rexroat moved to suppress the evidence on the ground it was obtained through an unlawful search. At the suppression hearing, the trial court questioned Rexroat as to whether he merely challenged "the reasonableness or the scope of the search" but not the officer's right to search. Rexroat's attorney responded affirmatively to the court's depiction of the issue.

The State asserted the search was "strictly and purely a consent search." In denying the motion to suppress and finding the search reasonable, the trial court stated:

"Certainly it is pretty clear that the Shawnee County Sheriff has the duty and the right to have security in the courthouse and search individuals going through, and I agree that it is a consensual process that goes on with people entering the courthouse, that they know very quickly from all the signs and rather obviously that they are subject to search.

"And also there are more than just weapons that are prohibited from the courthouse. There is mace, pepper spray, all kinds of things that are prohibited and I don't know whether the record reveals this, but I will take judicial notice of the fact since I go in and out of that everyday and I empty my pockets to go through security that several things are prohibited beyond weapons.

"So the Court finds under the circumstances given in these cases—in this case that there is nothing obtrusive or over-reaching by the officer in this matter and that the search was reasonable."

Rexroat properly preserved this issue for appeal by objecting at his bench trial to the introduction of the methamphetamine obtained from the search in question.

*Standard of Review*

When a motion to suppress evidence is filed, the State bears the burden of proving to the trial court the lawfulness of the search and seizure. *State v. Damm,* 246 Kan. 220, 222, 787 P.2d 1185 (1990) (citing *Mincey v. Arizona,* 437 U.S. 385, 390-91, 57 L. Ed. 2d 290, 98 S. Ct. 2408 [1978]). If the findings of the trial court on a motion to suppress evidence are based on substantial evidence, the appellate court must not substitute its view of the evidence for that of the trial court. *State v. Chiles,* 226 Kan. 140, 144, 595 P.2d 1130 (1979).

Substantial evidence was recently described in *State v. Haskins,* 262 Kan. 728, Syl. ¶ 1, 942 P.2d 16 (1997):

"Substantial evidence is evidence which possesses both relevance and substance and which furnishes a substantial basis of fact from which the issues can reasonably be resolved. Stated in another way, substantial evidence is such legal and relevant evidence as a reasonable person might accept as being sufficient to support a conclusion."

When the facts material to a motion to suppress evidence are not in dispute, the question of whether to suppress becomes a question of law, *State v. Vandiver,* 19 Kan. App. 2d 786, 788, 876 P.2d 205 (1994), *aff'd* 257 Kan. 53, 891 P.2d 350 (1995), upon which our scope of review is unlimited. *State v. Heffelman,* 256 Kan. 384, 386, 886 P.2d 823 (1994).

*Contentions of the parties*

Rexroat makes the narrow argument that while it is reasonable to search all persons as they enter a courthouse considering the need to protect the people inside from armed individuals, it is unreasonable if the search extends beyond determining whether an individual is armed and, thus, violates the Fourth Amendment.

Rexroat also claims the search exceeded the limited scope justified by *Terry* when the officer opened the film canister. He further maintains the plain feel exception adopted by this court in *State v. Wonders,* 263 Kan. 582, 952 P.2d 1351 (1998), is not applicable because the officer could not have recognized the canister contained drugs without opening it.

The State makes numerous arguments for upholding the search. It argues that even if *Terry* is applicable, the canister could have contained a weapon or dangerous instrument such as a needle or razor blade, making removing and opening the canister reasonable.

The State contends the search was proper under the "plain feel" exception to the Fourth Amendment as adopted by the United States Supreme Court in *Minnesota v. Dickerson*, 508 U.S. 366, 124 L. Ed. 2d 334, 113 S. Ct. 2130 (1993), and our court in *State v. Wonders*.

The State further argues that because a person entering the courthouse knows he or she is subject to a weapons search, no expectation of privacy exists to shield person from such a search, relying on *Katz v. United States*, 389 U.S. 347, 361, 19 L. Ed. 2d 576, 88 S. Ct. 507 (1967). *Katz* held a justifiable expectation of privacy only exists if it is one that "society is prepared to recognize as 'reasonable.'" The State contends that if we were to find an absolute expectation of privacy, it would effectively nullify the purpose of searching individuals for weapons or other dangerous materials prior to allowing them to enter courthouses.

Finally, the State contends the search of the canister was consensual, pointing to the trial court's holding that "it is a consensual process that goes on with people entering the courthouse, that they know very quickly from all the signs and rather obviously that they are subject to search." The State reasons that because Rexroat knew he would be searched and entered the courthouse of his own free will, he consented to the reasonable search that was made.

*Rexroat consented to the search when he voluntarily entered the courthouse.*

Justice Allegrucci summarized the requirements for a waiver of Fourth Amendment rights by an individual in *State v. Ruden*, 245 Kan. 95, 105, 774 P.2d 972 (1989), when he wrote:

"An individual may waive the requirement of a search warrant or consent to a search without a warrant, but the State has the burden to show such consent or waiver is voluntarily, intelligently, and knowingly given. *State v. Jakeway*, 221 Kan. 142, Syl. ¶ 4, 558 P.2d 113 (1976). The existence and voluntariness of a consent to search and seizure is a question of fact that the trier of fact must decide in light of the totality of the circumstances; the trial court's decision will not be overturned

on appeal unless clearly erroneous. *State v. Buckner*, 223 Kan. 138, 144, 574 P.2d 918 (1977). The State must prove voluntariness by a preponderance of the evidence. 223 Kan. at 143."

The trial judge found that Rexroat consented to the search upon entry to the courthouse when he held at the suppression hearing:

"Certainly it is pretty clear that the Shawnee County Sheriff has the duty and the right to have security in the courthouse and search individuals going through, and I agree that it is a consensual process that goes on with people entering the courthouse, that they know very quickly from all the signs and rather obviously that they are subject to search."

We do not appear to have any Kansas cases discussing the issue of consent when a person enters a courthouse, but other jurisdictions do. In *McMorris v. Alioto*, 567 F.2d 897 (9th Cir. 1978), the 9th Circuit held that a person electing to pass through a checkpoint upon entering a courthouse had, in effect, given his implied consent to a search of his person and to the packages he carries in. The court notes that an individual is not physically forced to submit to a search and "may leave the premises at any time, even after activating the magnetometer." 567 F.2d at 901. The *McMorris* court states that although "consent to a search is exacted as the price of entering the courthouse . . ., the search is . . . consensual in the same way as in the airport search cases." 567 F.2d at 901.

Other jurisdictions have held courthouse and public building searches are consensual in nature. See *Bozer v. Higgins*, 157 Misc. 2d 160, 596 N.Y.S.2d 634 (1992) (holding that county courthouse searches are permissible because they are consensual and reasonable, based on the governmental interest of protecting judicial officers and court visitors, minimally intrusive, and uniformly applied); *Davis v. United States*, 532 A.2d 656 (D.C. 1987) (holding defendant voluntarily or impliedly consented to a search when he entered a government building where there was a sign on the front of the building, warning that all bags and brief cases would be subject to search before the person would be allowed to enter the building).

However, the courts in the cases cited above have held the search must be no more intrusive than necessary to protect against

the dangers sought to be avoided. See generally, *McMorris*, 567 F.2d 897.

The United States Supreme Court has held that searches of an individual before entering a courthouse, or other official buildings, or boarding an airplane is reasonable within the Fourth Amendment. In *Chandler v. Miller*, 520 U.S. 305, 323, 137 L. Ed. 2d 513, 117 S. Ct. 1295 (1997), Justice Ginsburg stated:

"We reiterate, too, that where the risk to public safety is substantial and real, blanket suspicionless searches calibrated to the risk may rank as 'reasonable'—for example, searches now routine at airports and at entrances to courts and other official buildings."

In *Treasury Employees v. Von Raab*, 489 U.S. 656, 103 L. Ed. 2d 685, 109 S. Ct. 1384 (1989), the Fourth Amendment was held not to be violated by United States customs drug testing requirement for employees seeking transfer or promotion. Comparisons were made to searches at airports by the following footnote:

"3. The point is well illustrated also by the Federal Government's practice of requiring the search of all passengers seeking to board commercial airliners, as well as the search of their carry-on luggage, without any basis for suspecting any particular passenger of an untoward motive. Applying our precedents dealing with administrative searches, see, *e.g., Camara v. Municipal Court of San Francisco*, 387 U.S. 523[, 18 L. Ed. 2d 930, 87 S. Ct. 1727] (1967), the lower courts that have considered the question have consistently concluded that such searches are reasonable under the Fourth Amendment. As Judge Friendly explained in a leading case upholding such searches:

'When the risk is the jeopardy to hundreds of human lives and millions of dollars of property inherent in the pirating or blowing up of a large airplane, that danger *alone* meets the test of reasonableness, so long as the search is conducted in good faith for the purpose of preventing hijacking or like damage and with reasonable scope and the passenger has been given advance notice of his liability to such a search so that he can avoid it by choosing not to travel by air.' *United States v. Edwards*, 498 F.2d 496, 500 (CA2 1974) (emphasis in original).

See also *United States v. Skipwith*, 482 F.2d 1272, 1275-1276 (CA5 1973); *United States v. Davis*, 482 F.2d 893, 907-912 (CA9 1973). It is true, as counsel for petitioners pointed out at oral argument, that these air piracy precautions were adopted in response to an observable national and international hijacking crisis. Tr. of Oral Arg. 13. Yet we would not suppose that, if the validity of these searches be conceded, the Government would be precluded from conducting them absent a demonstration of danger as to any particular airport or airline. It is sufficient

that the Government have a compelling interest in preventing an otherwise pervasive societal problem from spreading to the particular context.

"Nor would we think, in view of the obvious deterrent purpose of these searches, that the validity of the Government's airport screening program necessarily turns on whether significant numbers of putative air pirates are actually discovered by the searches conducted under the program. In the 15 years the program has been in effect, more than 9.5 *billion* persons have been screened, and over 10 *billion* pieces of luggage have been inspected. See Federal Aviation Administration, Semiannual Report to Congress on the Effectiveness of The Civil Aviation Program (Nov. 1988) (Exhibit 6). By far the overwhelming majority of those persons who have been searched, like Customs employees who have been tested under the Service's drug-screening scheme, have proved entirely innocent—only 42,000 firearms have been detected during the same period. *Ibid.* When the Government's interest lies in deterring highly hazardous conduct, a low incidence of such conduct, far from impugning the validity of the scheme for implementing this interest, is more logically viewed as a hallmark of success. See *Bell v. Wolfish*, 441 U.S. 520, 559[, 60 L. Ed. 2d 447, 99 S. Ct. 1861] (1979)."

The members of this court understand and agree with the statement made by the 9th Circuit in *McMorris* that "[t]he serenity of the court of appeals [Supreme Court] is not so debilitating that we fail to appreciate the real dangers posed by threats of violence directed at other courthouses and government facilities." 567 F.2d at 900.

Whether we look at individuals entering courthouses as possessing only a limited right of privacy or to have consented to any reasonable search, the actions of Deputy Crane in locating the film canister and opening it were proper. Rexroat does not contest the reasonableness of the search but would prohibit the opening of closed containers to determine if it contains material potentially harmful to the occupants of the courthouse. We are not prepared to tie the hands of the law enforcement community who guard court buildings and prevent them from making an adequate determination of the contents of closed containers that could contain needles, sharp objects that might injure or kill, sprays or dust that might provide distraction for criminal activities, items or material which might damage or harm individuals, or drugs that could be passed to a prisoner and smuggled into a secure law enforcement facility.

We specifically hold that Rexroat consented to the search that was reasonable in all respects. It is not a violation of his Fourth Amendment rights.

Because of the result we reach, we do not address Rexroat's other arguments which would not affect our affirmance.

In affirming the trial court, we uphold reasonable searches of all individuals entering courthouses where metal detectors are in place. Individuals understand the nature of and consent to searches that will be made. As long as the search is reasonable under the facts of the case, Fourth Amendment rights are not violated.

Affirmed.