Nos. 83,793,
83,794,
83,795

IN THE MATTER OF L.A., D.O.B.: 6-8-81.

(21 P.3d 952)

Opinion filed March 16, 2001.

*Janet S. Helsel,* of Wichita, was on the brief for appellant.

*Lesley A. McFadden,* assistant district attorney, *Nola Foulston,* district attorney, and *Carla J. Stovall,* attorney general, was on the brief for appellee.

The opinion of the court was delivered by

LOCKETT, J.: A juvenile offender appeals adjudications in three separate cases involving drug offenses. The juvenile was placed in the custody of the Commissioner of Juvenile Justice for commitment to a juvenile correctional facility. The orders were stayed, and the juvenile was placed on intensive supervised probation with electronic monitoring for 90 days. The cases were consolidated for purposes of appeal and are set out separately in the opinion. The juvenile contends that (1) the search by school officials constituted governmental action which violated his Fourth Amendment rights, (2) his admission after a *Miranda* warning to a law enforcement officer was not admissible because it was tainted by a prior unwarned statement, (3) during the investigation of a possible burglary, law enforcement officers had no reasonable articulable suspicion to frisk pursuant to K.S.A. 22-2402, and (4) the denial of a jury trial violated his constitutional right to a jury trial.

## Case No. 83,793, Possession of Diazepam and Marijuana

On March 3, 1998, Dr. Louise Herrington, assistant vice principal at Campus High School in Haysville, Kansas, received information from the school Crime Stoppers organizer, the school librarian, that 16-year-old L.A. (D.O.B. 6/18/81) was in possession of marijuana concealed in the headband of his baseball cap. The Crime Stoppers organizer had received the information from a student.

Herrington requested Paul Schmidt, the school security guard, to bring L.A. and his baseball cap to Herrington's office. Schmidt brought L.A. into Herrington's office. L.A. had his baseball cap and book bag. L.A. was not advised of his *Miranda* rights. Herrington told L.A. of the Crime Stoppers tip and asked if he had anything illegal in his possession. L.A. said, "No." Herrington then telephoned L.A.'s mother and requested permission to search L.A. L.A.'s mother consented to the search and remained on the telephone line while Herrington and Schmidt conducted the search.

Herrington asked L.A. to empty his pockets on her desk. L.A. complied. Herrington then told L.A. to give his coat to Schmidt. In L.A.'s coat pocket, Schmidt found a small bottle of tablets and a loose tablet. Herrington asked L.A. to give his cap to Schmidt. Schmidt found a green botanical substance in the headband of L.A.'s cap. Herrington then searched L.A.'s book bag. Herrington discovered pills in a punch-out foil packet in the book bag. In response to questions by Schmidt, L.A. admitted that the substance in his headband was marijuana that he intended to smoke after school. L.A. identified the pills as Valium.

During the search of L.A., Herrington informed L.A.'s mother over the telephone what items were found. Herrington requested L.A.'s mother to come to the school. While Herrington waited for the arrival of L.A.'s mother, she explained to L.A. the school policy concerning illegal substances.

Schmidt called the Sedgwick County Sheriff's Department and reported the substances found in L.A.'s possession. A deputy sheriff was dispatched to the school. After the deputy and L.A.'s mother arrived, the deputy advised L.A. of his *Miranda* rights. L.A. agreed to answer questions.

L.A. told the deputy that the pills were Valium and that he had brought the Valium from home because he was having headaches. L.A.'s mother stated to the deputy that the Valium had not come from her house. In response to further questioning, L.A. told the deputy that he intended to meet a friend who had a pipe after school and smoke the marijuana found in his cap. L.A. refused to name his friend.

L.A. was charged in Sedgwick County District Court, Juvenile Department, with possession of diazepam and possession of marijuana. L.A. moved for a jury trial, and the court denied the motion. The court adjudicated L.A. a juvenile offender on both counts and ordered out-of-home placement. The court's order was stayed for 90 days. L.A. was placed on intensive supervision.

## Search by School Officials

In a motion to suppress evidence L.A. contended that the search by the assistant school principal and the school security officer of his person, hat, and book bag constituted governmental action which violated his Fourth Amendment rights. The trial judge denied L.A.'s motion to suppress.

At the hearing on a motion to suppress evidence, the State bears the burden of proving to the trial court the lawfulness of the search and seizure. Great deference is given to the factual findings of the trial court; however, the ultimate determination of the suppression of evidence is a legal question requiring independent appellate determination. *State v. Vandiver*, 257 Kan. 53, 57-58, 891 P.2d 350 (1995).

On appeal, L.A. first asserts that the search of his pockets, book bag, and ball cap was not authorized or justified by a reasonable suspicion that contraband would be found in the search. The State admits that L.A.'s expectations of privacy are protected by the Fourth Amendment's protection against unreasonable searches. It agrees that in a school setting restrictions upon public authorities are subject to *New Jersey v. T.L.O.*, 469 U.S. 325, 334, 341, 83 L. Ed. 2d 720, 105 S. Ct. 733 (1985), where the United States Supreme Court found that the Fourth Amendment prohibition

against unreasonable searches and seizures applies to all searches conducted by public school officials.

In *T.L.O.*, two students were caught smoking in a school bathroom. The assistant principal conducted a search of T.L.O.'s purse and found a pack of cigarettes. Evidence of marijuana use was found in an initial search. A more extensive search of the purse produced marijuana. Juvenile proceedings were initiated. T.L.O. moved to suppress the evidence seized. The New Jersey juvenile court determined that although the Fourth Amendment prohibition of unreasonable searches applied to searches by school officials, since the assistant principal had a reasonable suspicion that T.L.O. possessed cigarettes, the search was not unreasonable. The New Jersey appellate division affirmed the lower court's Fourth Amendment ruling. T.L.O. appealed the denial of the motion to suppress to the New Jersey Supreme Court. That court noted that school officials were bound by the Fourth Amendment. The court determined that reasonable suspicion to search the purse was not present and suppressed the evidence. The United States Supreme Court granted certiorari.

The United States Supreme Court noted that in carrying out searches and other disciplinary functions pursuant to such policies, school officials act as representatives of the State, not merely as surrogates for the parents, and they cannot claim the parents' immunity from the strictures of the Fourth Amendment. *T.L.O.*, 469 U.S. at 336-37. It observed that to hold that the Fourth Amendment applies to searches conducted by school authorities is only to begin the inquiry into the standards governing such searches. It observed that although the underlying command of the Fourth Amendment is always that searches and seizures be reasonable, what is reasonable depends on the context within which a search takes place. The determination of the standard of reasonableness governing any specific class of searches requires "balancing the need to search against the invasion which the search entails." *Camara v. Municipal Court*, 387 U.S. 523, 536-537, 18 L. Ed. 2d 930, 87 S. Ct. 1727 (1967). On one side of the balance are arrayed the individual's legitimate expectations of privacy and personal secu-

rity; on the other, the government's need for effective methods to deal with breaches of public order. *T.L.O.*, 469 U.S. at 337.

The *T.L.O.* Court then noted that the Fourth Amendment does not protect subjective expectations of privacy that are unreasonable or otherwise "illegitimate." 469 U.S. at 338 (citing *Hudson v. Palmer*, 468 U.S. 517, 82 L. Ed. 2d 393, 104 S. Ct. 3194 [1984]; *Rawlings v. Kentucky*, 448 U.S. 98, 65 L. Ed. 2d 633, 100 S. Ct. 2556 [1980]). To receive the protection of the Fourth Amendment, an expectation of privacy must be one that society is "prepared to recognize as legitimate." 469 U.S. at 338. It recognized that schoolchildren may find it necessary to carry with them a variety of legitimate, noncontraband items, and there is no reason to conclude that they have necessarily waived all rights to privacy in such items merely by bringing them onto school grounds. 469 U.S. at 339.

The *T.L.O.* Court acknowledged that a schoolchild's interest in privacy must be set against the substantial interest of teachers and administrators in maintaining discipline in the classroom and on school grounds. The Court noted that maintaining order in the classroom has never been easy, but in recent years, school disorder has often taken particularly ugly forms: drug use and violent crime in the schools have become major social problems. 469 U.S. at 339 (citing 1 NIE, U.S. Dept. of Health, Education, and Welfare, Violent Schools—Safe Schools: The Safe School Study Report to the Congress [1978]). The Court pointed out that it previously had recognized that maintaining security and order in the schools requires a certain degree of flexibility in school disciplinary procedures and had respected the value of preserving the informality of the student-teacher relationship. 469 U.S. at 339-40.

The *T.L.O.* Court stated:

"How, then, should we strike the balance between the schoolchild's legitimate expectations of privacy and the school's equally legitimate need to maintain an environment in which learning can take place? It is evident that the school setting requires some easing of the restrictions to which searches by public authorities are ordinarily subject. The warrant requirement, in particular, is unsuited to the school environment: requiring a teacher to obtain a warrant before searching a child suspected of an infraction of school rules (or of the criminal law) would

unduly interfere with the maintenance of the swift and informal disciplinary procedures needed in the schools." 469 U.S. at 340.

*T.L.O.* held under such circumstances school officials need not obtain a warrant before searching a student who is under their authority.

The United States Supreme Court further noted that the school setting requires some modification of the level of suspicion of illicit activity needed to justify a search. The Court stated that

"[o]rdinarily, a search—even one that may permissibly be carried out without a warrant—must be based upon 'probable cause' to believe that a violation of the law has occurred. . . . However, 'probable cause' is not an irreducible require ment of a valid search. The fundamental command of the Fourth Amendment is that searches and seizures be reasonable, and although 'both the concept of probable cause and the requirement of a warrant bear on the reasonableness of a search, . . . in certain limited circumstances neither is required.' [Citation omitted.]" 469 U.S. at 340.

The United States Supreme Court observed that the accommodation of the privacy interests of schoolchildren with the substantial interest of teachers and administrators in maintaining order in the schools does not require strict adherence to the requirement that searches be based on probable cause to believe that the subject of the search has violated or is violating the law. Rather, the legality of a search of a student depends simply on the reasonableness, under all the circumstances, of the search. In a plurality opinion, the Supreme Court set out a two-part test for determining the reasonableness of any search: "First, one must consider 'whether the . . . action was justified at its inception,' [citation omitted]; second, one must determine whether the search as actually conducted 'was reasonably related in scope to the circumstances which justified the interference in the first place.' " 469 U.S. at 341-42 (quoting *Terry v. Ohio*, 392 U.S. 1, 20, 20 L. Ed. 2d 889, 88 S. Ct. 1868 [1968]).

The Court held that under

"ordinary circumstances, a search of a student by a teacher or other school official will be 'justified at its inception' when there are reasonable grounds for suspecting that the search will turn up evidence that the student has violated or is violating either the law or the rules of the school. Such a search will be permissible in its

scope when the measures adopted are reasonably related to the objectives of the search and not excessively intrusive in light of the age and sex of the student and the nature of the infraction." 469 U.S. at 341-42.

The Court determined that the search of T.L.O. by school officials was justified at its inception. Since the scope of the search was reasonably related to the circumstances which justified the initial interference, the Court found that the search of T.L.O. was reasonable. 469 U.S. at 347.

Since *T.L.O.* was decided, state and lower federal courts have applied the federal reasonable suspicion standard to school searches. See, *e.g., State v. Serna*, 176 Ariz. 267, 860 P.2d 1320 (1993); *People in Interest of P.E.A.*, 754 P.2d 382 (Colo. 1988); *Martens v. District No. 220, Bd. of Educ.*, 620 F. Supp. 29 (N.D. Ill 1985);.

In *Martens*, an anonymous phone tip informed the dean of students that Martens had sold marijuana in the school. Martens was brought to the principal's office and held 45 minutes for questioning. A police officer, at the school on other business, convinced Martens to empty his pockets, and a pipe with marijuana residue was discovered. Applying the *T.L.O.* test, the court found reasonable suspicion based on the anonymous phone tip and the substantial drug problem faced by the school. 620 F. Supp. at 32.

In *P.E.A.*, a police officer was given a tip by a youngster that two students were planning to sell marijuana at a high school. The police officer immediately informed the principal of the planned drug sale. An extensive search was then conducted of the two individuals, which turned up nothing. Upon further investigation, the school officials learned that one of the individuals rode to school with P.E.A. Following an unproductive search of P.E.A. and two other individuals suspected of possessing drugs, a school security officer conducted a search of P.E.A.'s car in the school's parking lot. The search turned up a substantial amount of marijuana. The Colorado Supreme Court applied the *T.L.O.* reasonableness standard and held that the school officials were justified in searching the car and that the scope of the search was reasonably related to the objectives of the search. *P.E.A.*, 754 P.2d at 388-89.

Here, in evaluating the reasonableness of the search where without a *Miranda* warning L.A. was required to remove the items from his pockets, marijuana was taken from his cap, and Valium was found in his book bag, we must first consider whether the search was justified at its inception.

The school authorities' suspicion that L.A. possessed contraband was initiated by a student tip to the school's Crime Stoppers organizer. The tip contained information that L.A. carried the contraband in the band of his cap. Information provided by an informant can serve as a basis for a reasonable suspicion that a student may be engaged in illegal activity. See, *e.g.*, *In re Corey L.*, 203 Cal. App. 3d 1020, 250 Cal. Rptr. 359 (1988) (report of student that the accused student possessed cocaine was found to be basis for reasonable suspicion); *Edwards For and In Behalf of Edwards v. Rees*, 883 F.2d 882, 884 (10th Cir. 1989) (42 U.S.C. § 1983 lawsuit where court applied *T.L.O.* factors, and two students implicating another student in bomb threat found to be basis for reasonable suspicion to seize suspected student for questioning). When Schmidt found L.A. and brought him to the assistant vice principal's office, L.A. was in possession of a ball cap and book bag. We find that the tip by a student to the Crime Stoppers organizer was the basis of reasonable suspicion.

The second inquiry is whether the search conducted by school officials was reasonably related to the circumstances which justified the initial interference. We conclude that the search of L.A. was based on reasonable suspicion in that the search was conducted after school officials received a tip stating that L.A. was carrying contraband in the headband of his cap, and the scope of the search was within reasonable limits suggested by the tip. The trial judge did not err in denying L.A.'s motion to suppress the evidence found in the search.

L.A. also raises the issue of whether his mother could effectively waive his right to freedom from unreasonable searches. Because the search of L.A. was not unreasonable, the consent of L.A.'s parent was not necessary to satisfy constitutional standards.

### *Miranda* Warnings

The trial court denied a motion by L.A. to suppress statements he made to Schmidt that the marijuana and Valium found in his possession belonged to him. The trial court held that there was no governmental action requiring the use of *Miranda* warnings and admitted L.A.'s statements over his objection. L.A. contends that the trial court erred in denying the motion because Schmidt's questioning was the equivalent of a custodial interrogation by a law enforcement officer and, as such, required *Miranda* warnings. The State contends that Schmidt's duties as a school security officer fall outside the scope of a law enforcement officer, making the Fifth Amendment inapplicable. Neither party cites case law supporting their respective positions.

The issue presented is a question of law. The appellate courts have unlimited review of questions of law. *Gillespie v. Seymour*, 250 Kan. 123, 129, 823 P.2d 782 (1991).

In *Miranda v. Arizona*, 384 U.S. 436, 479, 16 L. Ed. 2d 694, 86 S. Ct. 1602 (1966), the United States Supreme Court held that certain warnings must be given before a suspect's statement made during custodial interrogation can be admitted in evidence. *Miranda* requires a procedure that will warn a suspect in custody of his or her right to remain silent and assure the suspect that the exercise of that right will be honored. 384 U.S. at 467-68. *Miranda* was recently reaffirmed by the United States Supreme Court in *Dickerson v. United States*, 530 U.S. 428, 147 L. Ed. 2d 405, 120 S. Ct. 2326 (2000) (striking down 18 U.S.C. § 3502 [providing that the admissibility of custodial statements turns only on whether they are voluntarily made] and holding that *Miranda* and its progeny in the United States Supreme Court govern the admissibility of statements made during custodial interrogation in both state and federal courts).

L.A. relies on K.S.A. 72-8222 for his contention that a school security officer, as a state actor with general law enforcement powers, is bound by the Constitution to provide *Miranda* warnings before questioning a student regarding criminal acts.

K.S.A. 72-8222 defines the authority of a school security officer:

"[T]he protective function of school security officers and school law enforcement officers shall extend to all school district property and the protection of students, teachers and other employees together with the property of such persons on or in any school or college property or areas adjacent thereto, or while attending or located adjacent thereto, or while attending or located at the site of any school or community college-sponsored function. While engaged in the protective functions specified in this section, each school security officer and each school law enforcement officer shall possess and exercise *all general law enforcement powers*, rights, privileges, protections, and immunities in every county in which there is located any part of the territory of the school district or community college." (Emphasis added.)

The State points to the definition of law enforcement officer provided in the Kansas Criminal Code:

" 'Law enforcement officer' means any person who by virtue of such person's office or public employment is vested by law with a duty to maintain public order or to make arrests for crimes, whether that duty extends to all crimes or is limited to specific crimes or any officer of the Kansas department of corrections or for the purposes of K.S.A. 21-3409, 21-3411 and 21-3415 and subsection (a)(2) of K.S.A. 21-3413 and amendments thereto, any employee of the Kansas department of corrections." K.S.A. 21-3110(10).

The State argues that because school security officers do not have the power to make arrests, they are not law enforcement officers. The State fails to recognize that K.S.A. 21-3110(10) is worded in the disjunctive whereas the power to make arrests is one of several alternative characteristics of a law enforcement officer.

*Miranda* warnings are required only with respect to "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda*, 384 U.S. at 444. *Miranda* "does not apply outside the context of inherently coercive custodial interrogations for which it was designed. The warnings protect persons who, exposed to such interrogation without the assistance of counsel, otherwise might be unable to make a free and informed choice to remain silent." *Roberts v. United States*, 445 U.S. 552, 560-61, 63 L. Ed. 2d 622, 100 S. Ct. 1358 (1980). At least two states, California and Washington, have considered the issue and determined that questioning of a student by a school security officer does not implicate *Miranda*.

In *State v. Wolfer*, 39 Wash. App. 287, 693 P.2d 154 (1985), a juvenile contended that his statements to a school security officer were made without proper advisement of his rights under *Miranda*. The juvenile argued that he was subject to custodial interrogation and that, because the security officer was an agent of the State, he was entitled to *Miranda* warnings. The *Wolfer* court adopted a test articulated by the California Court of Appeals in *People v. Wright*, 249 Cal. App. 2d 692, 694-95, 57 Cal. Rptr. 781 (1967):

> "It does not matter that a particular employee's duties may be confined to the protection of persons and property on his employer's premises or that his employer may be the state, a political subdivision thereof or a local entity. What does matter is whether he is employed by an agency of government, federal, state, or local, whose primary mission is to enforce the law." *Wolfer*, 39 Wash. App. at 294.

The *Wolfer* court held that a person employed by a school security department and charged with responsibility of protecting people and property on the premises of the school district is not required to give *Miranda* warnings, since he or she is not employed by an entity whose primary responsibility is law enforcement.

The questioning of L.A. occurred in the principal's office where the security officer had brought L.A. from his classroom. The questioning was conducted by the school security officer. The school security officer carried out the search at the direction of the assistant vice principal.

The statutory function of a school security officer is to protect school district property and the students, teachers, and other employees on the premises of the school district. K.S.A. 72-8222. A school security officer is not employed by an entity whose primary responsibility is law enforcement. During an investigation of a violation of school policy, a school security officer is not required to give a student *Miranda* warnings.

### Admissions to Law Enforcement Officer

L.A. made the same admissions to a sheriff's deputy after receiving *Miranda* warnings that he earlier made to Schmidt without warnings. L.A. contends that because he had already given an unwarned admission to Schmidt, he had no reason to believe that he had not already incriminated himself; therefore, no purpose would

have been served by asserting his rights during the sheriff's questioning. In essence, he asserts that the first statement was not admissible and that the statement he made to the officer after waiving his rights under *Miranda* was tainted by the first unwarned statement to Schmidt.

"The Fifth Amendment prohibits only the use of compelled testimony. A noncoercive *Miranda* violation does not automatically taint post-*Miranda* statements. Though *Miranda* requires the suppression of an unwarned admission, the admissibility of any subsequent statement turns solely on whether the statement was knowingly and voluntarily made. Absent deliberately coercive or improper tactics in obtaining the initial statement, the mere fact that a suspect has made an unwarned admission does not warrant a presumption of compulsion. A subsequent administration of *Miranda* warnings to a suspect who has given a voluntary but unwarned statement ordinarily should suffice to remove the conditions that precluded admission of the earlier statement. In such circumstances, the finder of fact may reasonably conclude that the suspect made a rational and intelligent choice whether to waive or invoke his rights." *State v. Hedges,* 269 Kan. 895, Syl. ¶ 4, 8 P.2d 1259 (2000).

The drugs were found in L.A.'s possession during a legal search by the assistant vice principal and the school security officer. Neither person conducting the search was required to obtain a warrant to search L.A. or obligated to inform L.A. of his *Miranda* rights prior to questioning him. Therefore, there was no prior illegal statement to taint L.A.'s statement to the sheriff's deputy.

## Case No. 83,794, Possession of Marijuana

In the early morning hours of August 29, 1998, Haysville police officers were dispatched to investigate a report of a car burglary in progress. When the officers arrived in the area, a witness indicated that he had chased two white males until they entered an area between two houses. The officers entered the area and observed a tent in the backyard. Fresh footprints in the dewy grass led from the fence gate to the tent. After identifying themselves, the officers ordered the occupants of the tent to come out. Four male juveniles, including L.A., age 17, exited the tent.

The officer conducted a pat-down search of the juveniles for officer safety. The officers found a bag of green botanical substance in L.A.'s jeans pocket, which officers tentatively identified as ma-

rijuana. An officer then advised L.A. of his *Miranda* rights. L.A. invoked his right to remain silent. It was later determined that L.A. was not one of the two white males observed by the witness attempting to burglarize a vehicle. A complaint was filed in Sedgwick County District Court, Juvenile Department, against L.A., alleging possession of marijuana. Lab tests later confirmed that the substance was marijuana.

L.A. moved for a jury trial. The court denied the motion. L.A. moved the district court to suppress the results of the pat-down search. The court denied the motion. The court adjudged L.A. a juvenile offender on one count of possession of marijuana and ordered L.A. placed in the custody of the Commissioner of Juvenile Justice for commitment to a juvenile correctional facility. The order was stayed for 90 days. L.A. was placed on intensive supervision during the stay. L.A. appealed.

L.A. admits that the officers were justified in pursuing the two young men into the backyard. He contends, however, that the officers did not have a reasonable suspicion that L.A. was involved in criminal activity or any reason to believe L.A. was armed and dangerous. When the facts material to a decision of the court on a motion to suppress evidence are not in dispute, the question of whether to suppress is a question of law subject to unlimited review. *State v. Rexroat*, 266 Kan. 50, 53, 966 P.2d 666 (1998). K.S.A. 22-2402 provides:

"(1) Without making an arrest, a law enforcement officer may stop any person in a public place whom such officer reasonably suspects is committing, has committed or is about to commit a crime and may demand . . . the name [and] address of such suspect and an explanation of such suspect's actions.

"(2) When a law enforcement officer has stopped a person for questioning pursuant to this section and reasonably suspects that such officer's personal safety requires it, such officer may frisk such person for firearms or other dangerous weapons. If the law enforcement officer finds a firearm or weapon, or other thing, the possession of which may be a crime or evidence of crime, such officer may take and keep it until the completion of the questioning, at which time such officer shall either return it, if lawfully possessed, or arrest such person."

The officers were investigating a possible car burglary. It was dark, and the suspects were in a tent. Under *Terry v. Ohio*, 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968), and K.S.A. 22-

2402, to make a legal "stop and frisk" the officer must have a reasonable and articulable suspicion, based on facts known to him or her prior to the stop, that the individual stopped has committed, is committing, or is about to commit a crime. *State v. Bailey*, 247 Kan. 330, 333, 799 P.2d 977 (1990), *cert. denied* 500 U.S. 920 (1991). A police officer may conduct a stop and frisk search of an individual without violating that individual's Fourth Amendment rights when he or she observes unusual, suspicious conduct which leads the officer reasonably to conclude that illegal activity may be occurring, or that his or her safety is in danger. The sole justification for the frisk is the officer's safety and the extent of the frisk must be limited to meet that objective. 392 U.S. at 29-30. Clearly, the officers had a reasonable and articulable suspicion that some individuals in the tent had committed a crime and, in such a situation, a frisk was justified for officer safety.

Here, the initial intrusion was lawful. The officer testified that based on his experience, he was certain from the outset that the object he felt in L.A.'s pocket was marijuana. In *State v. Wonders*, 263 Kan. 582, 952 P.2d 1351 (1998), this court recognized the plain feel exception to the search warrant requirement announced by the United States Supreme Court in *Minnesota v. Dickerson*, 508 U.S. 366, 124 L. Ed. 2d 334, 113 S. Ct. 2130 (1993). Under the plain feel exception, evidence found as a result of a pat down or frisk search is admissible where the initial intrusion which afforded the plain feel is lawful, the discovery of the evidence is inadvertent, and the incriminating character of the article is immediately apparent to the searching authorities. *Wonders*, 263 Kan. at 592. The officer was justified in seizing the marijuana. The court did not err in denying L.A.'s motion to suppress the evidence.

Case No. 83,795, Possession of LSD
with Intent to Sell Within 1,000 Feet of a School

At 7:45 a.m. on December 17, 1998, Schmidt, the security guard at Campus High School, observed L.A. sitting in a slumped position in the center of the front seat of his car. Concerned that L.A. was sick, Schmidt got out of his car to check on L.A. When Schmidt got to the side of L.A.'s car, he observed L.A. putting a powdery

substance inside small square pieces of aluminum tinfoil. Schmidt knocked on the window. L.A. quickly turned to look and, at the same time, began stuffing items in his pants. Schmidt asked L.A. to step out of the car and leave the items in the seat of the car. As L.A. exited the car, L.A. put a plastic baggie and several other items down the front of his pants.

Schmidt noticed when he opened L.A.'s car door that there were several items on the floorboard of the vehicle, including a large yellow canister and roach repellant. Schmidt called the school office on his radio and requested that an administrator come to the parking lot. While waiting for the school administrator to arrive, Schmidt asked L.A. to remove the items he had placed inside of his pants. Schmidt asked L.A. several times what L.A. had put into his pockets. L.A. did not answer Schmidt's questions.

Later, school administrators telephoned L.A.'s mother and requested permission to search L.A.'s car. L.A.'s parents denied permission and called their lawyer to come to the scene. At that point the police impounded L.A.'s car and called for a tow truck.

At the county yard the car was searched. Among the items found in L.A.'s car were 10 foil bindles (small packages) of "windowpane" LSD. One bindle was found on the front seat, another on the floorboard, and the remaining bindles were found under the floor mat on the driver's side of the car. A plastic baggie, some purple plastic strips, and scissors were also found in the front seat of the car.

A complaint was filed in Sedgwick County District Court, Juvenile Department, alleging that L.A. possessed LSD with intent to sell within 1,000 feet of a school and no tax stamp. As in the two previous adjudications discussed above, L.A. moved for a jury trial. The judge denied the motion. The judge adjudicated L.A. a juvenile offender on both counts. As in the two prior cases, L.A. was placed in the custody of the Commissioner of Juvenile Justice for commitment to a juvenile correctional facility, and the order was stayed for 90 days. L.A. was placed on intensive supervised probation with zero tolerance during the 90-day stay.

L.A. contends in this action that he was entitled to a jury trial in each case because the charge against him carried a potential period of confinement in a juvenile correctional facility. If L.A. had com-

mitted the crime on or after July 1, 1999, the penalty for L.A.'s offense would have been governed by K.S.A. 1999 Supp. 38-16,129, which, depending on the offender's criminal history and the severity of the offense, provides specific months of commitment the judge may impose for a juvenile committed to a juvenile correctional facility.

L.A. asserts that with the 1999 amendments to the Juvenile Offenders Code, the legislature has shifted the focus of juvenile offender proceedings from rehabilitation to punishment. He contends that because of the punitive focus of the amended Juvenile Offenders Code and because the penalty for his offense potentially included a period of confinement in a juvenile facility, he is entitled to a jury trial.

L.A.'s argument is based on legislative enactments not applicable to the facts of this case because his offense was committed prior to the amendments he perceives as punitive, and so his argument fails.

### Right to a Jury Trial

The Sixth Amendment to the United States Constitution, as applied to the states through the Fourteenth, requires that defendants tried as adults who are accused of serious crimes be afforded the right to trial by jury, and the right is applicable to any offense where imprisonment for more than 6 months is authorized. *State v. Irving*, 216 Kan. 588, 589, 533 P.2d 1225 (1995). This court has held that under the Kansas Juvenile Offenders Code (now Kansas Juvenile Justice Code), there is no federal or state constitutional right to a trial by jury. *Findlay v. State*, 235 Kan. 462, Syl. ¶ 1, 681 P.2d 20 (1984). However, if the offense the juvenile is accused of would be a felony if it were committed by an adult, the judge has the discretion to order a jury trial for the juvenile. See K.S.A. 38-1656.

The trial judge did not err in failing to grant L.A. a jury trial in the three adjudications. Affirmed.