186 P.3d 164 (2008)
In the Matter of L.M.
No. 96,197.
Supreme Court of Kansas.
June 20, 2008.
*165 Paul M. Shipp, of Kansas Legal Services, of Garden City, argued the cause and was on the brief for the appellant.
Stephen R. McAllister, solicitor general, argued the cause, and Lara Blake Bors, assistant county attorney, John P. Wheeler, Jr., county attorney, and Paul J. Morrison, attorney general, were with him on the briefs for appellee.
Marsha L. Levick, Jessica R. Feierman, and Riya S. Shah, of Philadelphia, Pennsylvania, were on the brief for amicus curiae Juvenile Law Center.
David Lowden, assistant district attorney, and Boyd K. Isherwood, assistant district attorney, of Wichita, were on the brief for amicus curiae Kansas County and District Attorneys Association.
The opinion of the court was delivered by ROSEN, J.:
L.M. seeks review of the Court of Appeals decision affirming his juvenile adjudication for aggravated sexual battery and being a minor in possession of alcohol. L.M. claims that he should have received a jury trial and argues that sweeping changes to juvenile justice procedures in Kansas since 1984 merit renewed scrutiny under applicable constitutional protections.
Sixteen-year-old L.M. was charged and prosecuted as a juvenile offender on one count of aggravated sexual battery in violation of K.S.A. 21-3518 and one count of minor in possession of alcohol in violation of K.S.A.2005 Supp. 41-727. The facts leading up to these charges involve a sexually suggestive confrontation between L.M. and a neighbor who was walking home. Further discussion of the facts is not relevant to the issue on appeal and will not be discussed herein. L.M. requested a jury trial, and the district court denied his request. After a trial to the bench, the district court found L.M. guilty as charged. The district court sentenced L.M. as a Serious Offender I to a term of 18 months in a juvenile correctional facility but stayed his sentence and ordered L.M. to be placed on probation until he was 20 years old. In addition, the district court ordered L.M. to complete sex offender treatment and register as a sex offender in accordance with K.S.A.2005 Supp. 22-4906.
L.M. appealed to the Court of Appeals, claiming that he had a constitutional right to a jury trial, that his statements to police should have been suppressed, and that the evidence was insufficient to support his convictions. The Court of Appeals affirmed the district court. See In re L.M., No. 96,197, 2006 WL 3775275, unpublished opinion filed December 22, 2006. L.M. filed a petition for review with this court on the sole issue of whether he had a constitutional right to a jury trial in a juvenile offender proceeding. We granted L.M.'s petition for review.
L.M. is challenging the constitutionality of K.S.A.2006 Supp. 38-2344(d), which provides that a juvenile who pleads not guilty is entitled to a "trial to the court," and K.S.A.2006 Supp. 38-2357, and which gives the district court complete discretion in determining whether a juvenile should be granted a jury trial. The constitutionality of a statute is a question of law subject to *166 unlimited review. State v. Allen, 283 Kan. 372, 374, 153 P.3d 488 (2007).
"`The constitutionality of a statute is presumed, all doubts must be resolved in favor of its validity, and before the statute may be stricken it must clearly appear that the statute violates the constitution. In determining constitutionality, it is the court's duty to uphold a statute under attack rather than defeat it, and if there is any reasonable way to construe the statute as constitutionally valid, that should be done." State v. Chamberlain, 280 Kan. 241, 246, 120 P.3d 319 (2005).

United States Constitution
L.M.'s first argument relies on the Sixth Amendment to the United States Constitution, which provides in pertinent part:
"In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed. . . . "
L.M. further relies on the United States Constitution's Fourteenth Amendment Due Process Clause, which provides in relevant part:
"No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property without due process of law. . . . "
Kansas has previously resolved this issue against L.M.'s position. Twenty-four years ago, under the statutes then controlling the disposition of juvenile offender cases, this court held that juveniles do not have a constitutional right to a jury trial under either the federal or state constitutions. Findlay v. State, 235 Kan. 462, 463-64, 681 P.2d 20 (1984). Acknowledging that the Sixth Amendment applies only to criminal prosecutions, the Findlay court concluded that juvenile adjudications then were not criminal prosecutions based on K.S.A.1982 Supp. 38-1601, which provided:
"`K.S.A.1982 Supp. 38-1601 through 38-1685 shall be known and may be cited as the Kansas juvenile offenders code and shall be liberally construed to the end that each juvenile coming within its provisions shall receive the care, custody, guidance, control and discipline, preferably in the juvenile's own home, as will best serve the juvenile's rehabilitation and the protection of society. In no case shall any order, judgment or decree of the district court, in any proceedings under the provisions of this code, be deemed or held to import a criminal act on the part of any juvenile; but all proceedings, orders, judgments and decrees shall be deemed to have been taken and done in the exercise of the parental power of the state.' (Emphasis supplied.)" 235 Kan. at 463, 681 P.2d 20.
The Findlay court also adopted the United States Supreme Court's reasoning in McKeiver v. Pennsylvania, 403 U.S. 528, 91 S.Ct. 1976, 29 L.Ed.2d 647 (1971), where a plurality of the Court held that juveniles are not entitled to a jury trial under the Sixth and Fourteenth Amendments to the Constitution.
In McKeiver, the United States Supreme Court addressed the constitutionality of the Pennsylvania and North Carolina juvenile justice systems, neither of which afforded juveniles the right to a jury trial. Although the resulting plurality opinion held that juveniles are not entitled to a jury trial under the federal constitution, the justices could not agree on the reasoning to support that holding. Four of the justices supported their decision with the following 13 policy considerations and assumptions or speculations about the impact of jury trials on juvenile proceedings:
(1) The Court had previously refrained from flatly holding that all constitutional rights assured to adults accused of crimes were imposed on state juvenile proceedings;
(2) Imposing jury trials might remake juvenile proceedings into fully adversarial proceedings, thereby putting an end to the intimate, informal proceedings envisioned by the creators of the juvenile justice system;
(3) A governmental task force that had studied the juvenile justice system did not make any recommendation regarding *167 jury trials as a means of improving the deficiencies and disappointments in the juvenile system;
(4) As noted in dictum in Duncan v. Louisiana, 391 U.S. 145, 149 n. 14, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968), a jury trial is not a necessary part of every fair and equitable criminal process;
(5) The imposition of a jury trial would not strengthen the factfinding process and would eliminate the juvenile system's ability to function in a unique way, placing the juvenile "squarely in the routine of the criminal process;"
(6) The Court was reluctant to preclude the States from experimenting with different ways of handling juvenile problems;
(7) The Court refrained from concluding that the abuses in the system were of constitutional dimension;
(8) Nothing prevented the juvenile court judge from using an advisory jury;
(9) Twenty-eight States and the District of Columbia denied juveniles the right to a jury trial, while 10 States provided a jury trial under certain circumstances;
(10) A great majority of States had previously concluded that In re Gault, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967), and Duncan did not require jury trials for juveniles;
(11) The Uniform Juvenile Court Act stopped short of proposing a jury trial;
(12) Injecting a jury trial into juvenile proceedings would bring "the traditional delay, the formality, and the clamor of the adversary system and, possibly, the public trial"; and
(13) The possibility of prejudgment by a judge who has had prior access to the juvenile, the juvenile's record, and the juvenile's social file would ignore every aspect of fairness, concern, sympathy, and paternal attention contemplated by the juvenile system. McKeiver, 403 U.S. at 545-50, 91 S.Ct. 1976.
Two concurring justices relied on other reasoning. Justice Harlan concurred with the result because he did not believe that the Sixth Amendment or the right to due process required the states to provide criminal jury trials for anyone. McKeiver, 403 U.S. at 557, 91 S.Ct. 1976 (Harlan, J., concurring). Justice Brennan also concurred with the result but relied on the concept of fundamental fairness. According to Justice Brennan, the State did not have to provide jury trials for juveniles as long as some other aspect of the process adequately protected the juvenile's Sixth Amendment interests by preventing governmental oppression. Justice Brennan concluded that the Pennsylvania system was adequate because it allowed public trials, thereby "exposing improper judicial behavior to public view, and obtaining, if necessary, executive redress through the medium of public indignation." 403 U.S. at 555, 91 S.Ct. 1976 (Brennan, J., concurring). Under this rubric, Justice Brennan concluded that the North Carolina system was not constitutionally sound because it did not allow public trials. 403 U.S. at 556-57, 91 S.Ct. 1976 (Brennan, J., concurring).
Justices Douglas, Black, and Marshall dissented, stating that "neither the Fourteenth Amendment nor the Bill of Rights is for adults alone." McKeiver, 403 U.S. at 559, 91 S.Ct. 1976 (quoting In re Gault, 387 U.S. at 13, 87 S.Ct. 1428). Noting that the "Sixth Amendment . . . speaks of denial of rights to `any person,' not denial of rights to `any adult person,'" the dissenting justices discerned no difference between allowing juveniles the right to a jury trial and the previously granted rights to notice, counsel, protection against self-incrimination, confrontation, and conviction under the beyond a reasonable doubt standard. 403 U.S. at 560-61, 91 S.Ct. 1976 (Douglas, J., dissenting). The dissenting justices looked behind the facade of the delinquency charge to the underlying criminal statute and concluded that juveniles who are prosecuted for a criminal act involving a potential loss of liberty are entitled to the same protections as adults accused of a crime. 403 U.S. at 560-61, 91 S.Ct. 1976.
L.M. recognizes the import of Findlay and McKeiver but asks us to overturn Findlay. L.M. raises three arguments to support his request. First, L.M. claims that the changes *168 in the Revised Kansas Juvenile Justice Code (KJJC), K.S.A.2006 Supp. 38-2301 et seq., have eroded the child-cognizant, paternal, and rehabilitative purposes of the juvenile offender process, thereby requiring us to recognize a juvenile's right to a jury trial under the federal Constitution. Second, L.M. argues that juveniles are entitled to a jury trial under the Kansas Constitution. Third, L.M. asserts that regardless of whether all juveniles are constitutionally entitled to a jury, he should have received one because he ran the risk of having to register as a sex offender.
We begin our analysis by noting that the Kansas Legislature has significantly changed the language of the Kansas Juvenile Offender Code (KJOC) since the Findlay court decided this issue 24 years ago. The juvenile code is now called the Revised Kansas Juvenile Justice Code. L.M. asserts that these changes to the code negated the rehabilitative purpose set forth in the KJOC. According to L.M., the negating of the rehabilitative purpose is evidenced by the replacement of nonpunitive terminology with criminal terminology similar to the adult criminal code, the alignment of the KJJC sentencing provisions with the adult sentencing guidelines, and the removal of the protections that the McKeiver Court relied on to distinguish juvenile systems from the adult criminal systems.
One of the key changes in the KJJC is reflected in K.S.A.2006 Supp. 38-2301, which sets forth the purpose for the KJJC, providing:
"This act shall be known and may be cited as the revised Kansas juvenile justice code. The primary goals of the juvenile justice code are to promote public safety, hold juvenile offenders accountable for their behavior and improve their ability to live more productively and responsibly in the community. To accomplish these goals, juvenile justice policies developed pursuant to the revised Kansas juvenile justice code shall be designed to: (a) Protect public safety; (b) recognize that the ultimate solutions to juvenile crime lie in the strengthening of families and educational institutions, the involvement of the community and the implementation of effective prevention and early intervention programs; (c) be community based to the greatest extent possible; (d) be family centered when appropriate; (e) facilitate efficient and effective cooperation, coordination and collaboration among agencies of the local, state and federal government; (f) be outcome based, allowing for the effective and accurate assessment of program performance; (g) be cost-effectively implemented and administered to utilize resources wisely; (h) encourage the recruitment and retention of well-qualified, highly trained professionals to staff all components of the system; (i) appropriately reflect community norms and public priorities; and (j) encourage public and private partnerships to address community risk factors." (Emphasis added.)
In 1982, the KJOC was focused on rehabilitation and the State's parental role in providing guidance, control, and discipline. See K.S.A.1982 Supp. 38-1601. However, under the KJJC, the focus has shifted to protecting the public, holding juveniles accountable for their behavior and choices, and making juveniles more productive and responsible members of society. See K.S.A.2006 Supp. 38-2301. These purposes are more aligned with the legislative intent for the adult sentencing statutes, which include protecting the public by incarcerating dangerous offenders for a long period of time, holding offenders accountable by prescribing appropriate consequences for their actions, and encouraging offenders to be more productive members of society by considering their individual characteristics, circumstances, needs, and potentialities in determining their sentences. See K.S.A. 21-4601.
In addition to being more aligned with the purpose of the criminal sentencing statutes, the KJJC also incorporates language similar to that found in the Kansas Criminal Code, see K.S.A. 21-3101 et seq., and the Kansas Code of Criminal Procedure, see K.S.A. 22-2101 et seq. Under the KJOC, juveniles were required to admit or deny the allegations against them or plead nolo contendere. K.S.A.1982 Supp. 38-1633(b). Under the KJJC, a juvenile is required to plead guilty, not guilty, or nolo contendere like adults charged with a crime. See K.S.A.2006 Supp. *169 22-3208; K.S.A. 38-2344(b). Although both the KJOC and the KJJC refer to an adjudication rather than a conviction, a "dispositional proceeding" under the KJOC is now referred to as a "sentencing proceeding" in the KJJC. See K.S.A.1982 Supp. 38-1605; K.S.A.2006 Supp. 38-2305(c). The "State youth center" referred to in the KJOC, K.S.A.1982 Supp. 38-1602(g), is now called a "Juvenile correctional facility," K.S.A.2006 Supp. 38-2302(j), which is more akin to an adult "correctional institution," K.S.A. 21-4602(e). Moreover, the KJJC emulates the language of the Kansas Criminal Code when it refers to the term of commitment to a juvenile correctional facility as a "term of incarceration." K.S.A. 21-4603d; K.S.A. 21-4608; K.S.A.2006 Supp. 38-2374; K.S.A.2006 Supp. 38-2376. This conceptualization of juvenile offenders stresses the similarities between child and adult offenders far more than it does their differences.
The legislature also emulated the structure of the Kansas Sentencing Guidelines when it established a sentencing matrix for juveniles based on the level of the offense committed and, in some cases, the juvenile's history of juvenile adjudications. See K.S.A. 21-4701 et seq.; K.S.A.2006 Supp. 38-2369. For example, a juvenile offender found guilty of committing an off-grid felony may be sentenced to "a juvenile correctional facility for a minimum term of 60 months and up to a maximum term of the offender reaching the age of 22 years, six months." K.S.A.2006 Supp. 38-2369(a)(1). A juvenile offender found guilty of committing a level 7, 8, 9, or 10 person felony with one prior felony adjudication may be sentenced to "a juvenile correctional facility for a minimum term of nine months and up to a maximum term of 18 months." K.S.A.2006 Supp. 2369(a)(2)(B).
Like the adult sentencing guidelines, the KJJC allows the sentencing judge to depart from the juvenile placement matrix upon a motion by the State or the sentencing judge. K.S.A. 21-4718; K.S.A.2006 Supp. 38-2371. The KJJC sentencing judge may consider the aggravating factors from K.S.A. 21-4716(c)(2) or K.S.A. 21-4717(a). K.S.A.2006 Supp. 38-2371(a)(3). If the sentencing judge departs from the presumptive sentence, he or she must state on the record the substantial and compelling reasons for the departure just as if he or she were sentencing an adult offender. See K.S.A. 21-4716(a); K.S.A.2006 Supp. 38-2371(d). Although any juvenile sentence within the presumptive sentencing range is not subject to appeal, juvenile departure sentences, like adult departure sentences, may be appealed. K.S.A.2006 Supp. 38-2380(b)(2)(A); (b)(3); (b)(4).
The KJJC is also similar to the adult sentencing guidelines in imposing a term of after-care on any juvenile sentenced in accordance with the juvenile placement matrix. See K.S.A. 21-4703(p); K.S.A. 21-4704(e)(2); K.S.A.2006 Supp. 38-2369. Another similarity between the KJJC and the adult sentencing guidelines is the juvenile offender's opportunity to earn good time credits to reduce his or her term of incarceration. K.S.A. 21-4722; K.S.A.2006 Supp. 38-2370.
In addition to reflecting the provisions of the sentencing guidelines, the KJJC also establishes sentencing options that are similar to those available for adult offenders. Both adults and juveniles may be sentenced to probation; a community-based program; house arrest; a short-term behavior-modification program like a sanctions house or conservation camp; placement in an out-of-home facility; or incarceration in a correctional facility. K.S.A.2006 Supp. 38-2302; K.S.A.2006 Supp. 38-2361(a)(1), (2), (9), (10), (11), (12); K.S.A. 21-4603d(a)(1), (3), (4), (5), (6); K.S.A. 21-4610(c)(9). The district court also has authority to order both adults and juveniles to attend counseling; drug and alcohol evaluations; mediation; or educational programs. K.S.A.2006 Supp. 38-2361(a)(4); K.S.A. 21-4603d(a)(7), (c); K.S.A. 21-4610(c)(9). In addition, the district court may require both adults and juveniles to perform charitable or community service; pay restitution; or pay a fine. K.S.A.2006 Supp. 38-2361(a)(6), (7), (8); K.S.A. 21-4603d(a)(2), (b); K.S.A. 21-4610(c)(10). Sentencing of juveniles has become much more congruent with the adult model.
Besides amending the 1982 version of the KJOC to reflect the purpose and provisions included in the adult criminal code, the legislature has removed some of the protective *170 provisions that made the juvenile system more child-cognizant and confidential, a key consideration in the McKeiver plurality decision. In 1982, juvenile proceedings were confidential. The official court file and all police records of any juvenile under the age of 16 were not open to the public. K.S.A. 1982 Supp. 38-1607; K.S.A.1982 Supp. 38-1608. Likewise, any hearing involving a juvenile under the age of 16 was confidential and the court could exclude anyone except the juvenile; his or her parents; the attorneys of any interested parties; officers of the court; and any testifying witness. K.S.A.1982 Supp. 38-1652.
However, under the KJJC, the official file must be open to the public unless a judge orders it to be closed for juveniles under the age of 14 based on finding that it is in the best interests of the juvenile. K.S.A.2006 Supp. 38-2309(b). Similarly, law enforcement records and municipal court records for any juvenile age 14 and over are subject to the same disclosure restrictions as the records for adults. K.S.A.2006 Supp. 38-2310(c). Only juveniles under the age of 14 may have their law enforcement and municipal records kept confidential. K.S.A.2006 Supp. 38-2310(a). The legislature has also eliminated the presumption of confidentiality for hearings, opening all hearings to the public unless the juvenile is under the age of 16 and the judge concludes that a public hearing would not be in the juvenile's best interests. K.S.A.2006 Supp. 38-2353.
These changes to the juvenile justice system have eroded the benevolent parens patriae character that distinguished it from the adult criminal system. The United States Supreme Court relied on the juvenile justice system's characteristics of fairness, concern, sympathy, and paternal attention in concluding that juveniles were not entitled to a jury trial. McKeiver, 403 U.S. at 550, 91 S.Ct. 1976. Likewise, this court relied on that parens patriae character in reaching its decision in Findlay. However, because the juvenile justice system is now patterned after the adult criminal system, we conclude that the changes have superseded the McKeiver and Findlay Courts' reasoning and those decisions are no longer binding precedent for us to follow. Based on our conclusion that the Kansas juvenile justice system has become more akin to an adult criminal prosecution, we hold that juveniles have a constitutional right to a jury trial under the Sixth and Fourteenth Amendments. As a result, K.S.A.2006 Supp. 38-2344(d), which provides that a juvenile who pleads not guilty is entitled to a "trial to the court," and K.S.A.2006 Supp. 38-2357, which gives the district court discretion in determining whether a juvenile should be granted a jury trial, are unconstitutional.
In reaching this conclusion, we are mindful of decisions in other jurisdictions rejecting the argument that changes to the juvenile justice system have altered its parens patriae character. See Valdez v. State, 33 Ark.App. 94, 801 S.W.2d 659 (1991); In re Myresheia W., 61 Cal.App.4th 734, 72 Cal.Rptr.2d 65 (1998); In re L.C., 273 Ga. 886, 548 S.E.2d 335 (2001); State, ex rel. D.J., 817 So.2d 26 (La.2002) (dissenting justice concluded changes to system required a jury trial); State v. Gleason, 404 A.2d 573 (Me.1979) (concluding new juvenile code retained beneficent and rehabilitative purposes of prior code); State v. Lawley, 91 Wash.2d 654, 591 P.2d 772 (1979) (three dissenting justices concluded changes in system shifted focus from offender to offense and so policy arguments in McKeiver were not controlling); State v. Schaaf, 109 Wash.2d 1, 10, 12-13, 743 P.2d 240 (1987) (noting rehabilitation was still purpose of juvenile code and differences continued to distinguish juvenile proceedings, which were not criminal proceedings, with one justice dissenting because juvenile code was punitive like criminal system).
We are also mindful that many of the state courts that have addressed this issue in one form or another have declined to extend the constitutional right to a jury trial to juveniles. See, e.g., David G. v. Pollard ex rel. County of Pima, 207 Ariz. 308, 314, 86 P.3d 364 (2004) (concluding trial court erred when it allowed a jury trial for a juvenile charged with traffic offenses because forcing a juvenile to be tried by a jury did not promote informality and flexibility of juvenile system and subjected juvenile to very stigma legislature sought to prevent); A.C., IV v. People, *171 16 P.3d 240, 244-45 (Colo.2001) (upholding statute that allowed trial court discretion in determining whether to allow a jury trial); In re J.T., 290 A.2d 821(D.C.), cert. denied 409 U.S. 986, 93 S.Ct. 339, 34 L.Ed.2d 252, (1972) (upholding statute that required trial court to hear and adjudicate juvenile cases without a jury); McMullen v. Geiger, 184 Neb. 581, 584, 169 N.W.2d 431 (1969) (holding juveniles do not have right to jury trial because it is a civil proceeding under State's parens patriae authority, four justices dissented); R. v. Cory, 353 N.Y.S.2d 783, 44 App.Div.2d 599 (1974) (holding a 15-year-old juvenile sentenced to an adult facility is not entitled to jury trial; dissent reasoned State is required to give child same constitutional rights given to criminals if it is going to treat child like a criminal); In re R.Y., 189 N.W.2d 644, 651-53, 655 (N.D.1971) (upholding statute that required juvenile trials to be heard by the court; concurring justice acknowledged that if juvenile code became only a punitive tool, then a jury trial might be justified under state constitution); State v. Hezzie R., 219 Wis.2d 848, 887, 889-90, 919, 580 N.W.2d 660 (1998) (holding juveniles do not have constitutional right to a jury trial but striking down statute that allowed juveniles to receive adult sentence without a jury trial; three justices dissented, reasoning juveniles should be entitled to a jury trial under all cases because changes to juvenile justice code treated juveniles like criminals).
While there is wide variability in the juvenile offender laws throughout the country, it nevertheless seems apparent to us that the KJJC, in its tilt towards applying adult standards of criminal procedure and sentencing, removed the paternalistic protections previously accorded juveniles while continuing to deny those juveniles the constitutional right to a jury trial. Although we do not find total support from the courts in some of our sister states, we are undaunted in our belief that juveniles are entitled to the right to a jury trial guaranteed to all citizens under the Sixth and Fourteenth Amendments to the United States Constitution.
The State relies on our more recent decision in In re L.A. 270 Kan. 879, 21 P.3d 952 (2001), to support its argument that juveniles are not entitled to a jury trial. However, we do not find L.A. persuasive. The L.A. court relied on Findlay without analyzing the distinctions between the KJOC and the KJJC. 270 Kan. at 895, 21 P.3d 952. As a result, it did not address the issue presented in this case.

Kansas Constitution
In addition to claiming a federal constitutional right to a jury trial, L.M. asserts that he has a right to a jury trial under the Kansas Constitution. L.M. relies on the Kansas Constitution Bill of Rights, Sections 1, 5, and 10, which provide:
§ 1. "All men are possessed of equal and inalienable natural rights, among which are life, liberty, and the pursuit of happiness."
§ 5. "The right of trial by jury shall be inviolate."
§ 10. "In all prosecutions, the accused shall be allowed to appear and defend in person, or by counsel; to demand the nature and cause of the accusation against him; to meet the witness face to face, and to have compulsory process to compel the attendance of the witnesses in his behalf, and a speedy public trial by an impartial jury of the county or district in which the offense is alleged to have been committed. No person shall be a witness against himself, or be twice put in jeopardy for the same offense." (Emphasis added.)
The plain language of § 10 extends the right to a jury trial to "all prosecutions." This court has previously interpreted the phrase "all prosecutions" to "mean all criminal prosecutions for violations of the laws of the state." State, ex rel. Mayer v. Pinkerton, 185 Kan. 68, 69, 340 P.2d 393 (1959) (denying a jury trial in a bastardy proceeding). In 1883, this court addressed the question of whether § 10 applied to a charge of maintaining a nuisance, i.e., a hog pen. In re Rolfs, Petitioner, 30 Kan. 758, 1 P. 523 (1883). In concluding that the defendant was entitled to a trial by jury, this court stated:
"So long, therefore, as the fundamental law contains the guaranty which it does, I think no party can be subjected to a prosecution *172 for an act of a criminal nature, whether that prosecution be brought by the state directly or any corporation created by the state, without in some way and before some tribunal being secured an opportunity of having the truth of that charge inquired into by an impartial jury of the district.
"A distinction should be noticed here. A prosecution which involves nothing of a criminal nature, as for instance, where one is charged with acting as an auctioneer, without a license, in violation of a city ordinance, (such an ordinance being a mere municipal regulation,) is not a criminal offense in the true legal sense of the term. As to such proceedings, the constitutional guaranty may not be applicable; but where the charge is of an act like the one at bar, criminal at common law, criminal in its nature, and an offense against the public, the constitutional guaranty is applicable and cannot be ignored or disregarded." 30 Kan. at 763, 1 P. 523.
The KJJC repeatedly refers to its proceedings as a prosecution. See K.S.A. 2006 Supp. 38-2303(c), (d); K.S.A.2006 Supp. 38-2304(e)(2); K.S.A.2006 Supp. 38-2346(a), (b)(1); K.S.A.2006 Supp. 38-2350; K.S.A. 2006 Supp. 38-2381. In addition, proceedings under the KJJC are based on allegations that juveniles have violated the criminal laws of this State. Because the KJJC has lost the parens patriae character of the former KJOC and has transformed into a system for prosecuting juveniles charged with committing crimes, we conclude that the proceedings under the KJJC fit within the meaning of the phrase "all prosecutions" as set forth in § 10, and juveniles have a right to a jury trial under the Kansas Constitution. Consequently, K.S.A.2006 Supp. 38-2344(d) and K.S.A.2006 Supp. 38-2357 are also unconstitutional under the Kansas Constitution.
As a third argument, L.M. asserts that even if all juveniles are not entitled to a jury trial, he should have received a jury trial because he was subject to registering as a sex offender, an adult sanction. Given our decision that juveniles have a right to a jury trial under the Sixth and Fourteenth Amendments to the federal Constitution and the Kansas Constitution, we decline to analyze this argument.
The district court and the Court of Appeals acted in accordance with our prior precedent in Findlay. However, we agree with L.M. that Findlay is no longer applicable because of the legislative overhaul to the juvenile justice code. The right to a jury trial in juvenile offender proceedings is a new rule of procedure; it does not operate retroactively. It does not create a new class of convicted persons, but merely raises "`the possibility that someone convicted with use of the invalidated procedure might have been acquitted otherwise.'" Drach v. Bruce, 281 Kan. 1058, 1073, 136 P.3d 390 (2006) cert. denied ___ U.S. ___, 127 S.Ct. 1829, 167 L.Ed.2d 317 (2007) (quoting Schriro v. Summerlin, 542 U.S. 348, 352, 124 S.Ct. 2519, 159 L.Ed.2d 442 [2004]). This right will apply only to cases pending on direct review or not yet final on the date of filing of this opinion. See State v. Francis, 282 Kan. 120, 126, 145 P.3d 48 (2006). Because L.M. was tried without a jury, his adjudication is reversed and this matter is remanded to the district court for a new trial before a jury.
Reversed.
DAVIS and JOHNSON, JJ., not participating.
GREENE, J., and LARSON, S.J., assigned.[1]
LUCKERT, J., concurring:
I concur in the majority's conclusion that L.M. has a constitutional right to trial by jury, but I base this conclusion on the rights guaranteed by § 5 of the Kansas Constitution Bill of Rights rather than the Sixth Amendment to the United States Constitution or § 10 of the Kansas Constitution Bill *173 of Rights, which are relied upon by the majority.
In my view, the considerations relevant to the application of the Sixth Amendment and § 10 to juvenile proceedings vary depending upon the nature of the offense charged and the juvenile's prior adjudications. In many cases, the due process considerations discussed in McKeiver v. Pennsylvania, 403 U.S. 528, 91 S.Ct. 1976, 29 L.Ed.2d 647 (1971), and Findlay v. State, 235 Kan. 462, 681 P.2d 20 (1984), remain largely unchanged under the Kansas Juvenile Justice Code (KJJC). As the dissent notes, the KJJC provides different procedures than those available in adult criminal prosecutions, including unique intake, predisposition, and disposition options. When these options apply and are utilized, the rationale of McKeiver and Findlay remains valid and applicable.
Nevertheless, for a discrete population of juvenile offenders, the KJJC's procedural and substantive provisions do not differ from those for adult criminal prosecution in any material way. For example, because of an offender's adjudicatory history or the nature of the offense, the unique intake procedures may not apply. K.S.A.2006 Supp. 38-2331(b) (juveniles who are fugitives, escapees, alleged sex offenders, violent individuals, or those with prior felony adjudications may be taken directly to secure facilities). From the point of arrest, the juveniles to whom the 38-2331(b) exceptions apply are treated much the same as an adult being prosecuted for the same crime, except the adult is entitled to a trial by jury and the juvenile is not, the juvenile is confined in a different secure facility than adults, and some procedures may vary in constitutionally insignificant ways. Granted, there is a difference in that once a juvenile offender is found guilty the juvenile may be held for a shorter period than an adult. Yet, a felony juvenile offender is confined to the custody of the state for significant periods of time  in some situations, for many years and for longer than some adults who receive a jury trial. Thus, for many juveniles in circumstances similar to L.M.'s, the denial of a jury trial is not constitutionally justified on due process grounds.
L.M. astutely recognizes this differentiation and makes an "as applied" due process argument, suggesting that even if the overall system maintains the qualities recognized in McKeiver and Findlay, the system did not treat him in such a manner. In my view, we need not reach the "as applied" argument that would result in a case-by-case analysis because of the rights granted by § 5 of the Kansas Constitution Bill of Rights, which L.M. asserts as an independent source of his right to jury trial. Although the majority mentions § 5, it does not conduct an analysis under that provision; similarly, in Findlay this court mentioned but did not discuss § 5 in reaching the opposite result. The dissent in this case does not mention § 5.
Section 5 of the Kansas Constitution Bill of Rights provides that the right to jury trial shall be inviolate. As explained in one of the earliest cases applying this provision:
"The constitutional provision that the right of trial by jury shall be inviolate . . . means that a jury trial is preserved in all cases in which it existed prior to the adoption of the constitution. It does not extend the right of trial by jury  it simply preserves it. It remains inviolate, that is, not disturbed or limited." In re Rolfs, 30 Kan. 758, 762, 1 P. 523 (1883).
Hence, the uncompromising language of the provision applies if an examination of history reveals there was a right at common law to a jury trial under the same circumstances. E.g., Craig v. Hamilton, 213 Kan. 665, 670, 518 P.2d 539 (1974).
This historical analysis has not been undertaken by many courts considering a juvenile's right to a jury trial even though many state constitutions contain similar provisions. Recently, these provisions have received renewed attention because of questions regarding the treatment of juvenile adjudications in light of three-strike legislation, sentencing guidelines, and the United States Supreme Court's decision in Apprendi v. New Jersey, 530 U.S. 466, 490, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000). For example, the issue is now pending before the California Supreme Court in the context of that court's discretionary review of a California Court of Appeals decision which held that juvenile *174 adjudications, even by plea, could not count as a strike under that state's three-strike rule because there was no right to a jury trial. People v. Nguyen, 62 Cal.Rptr.3d 255, rev. granted 67 Cal.Rptr.3d 460, 169 P.3d 882 (2007). In the decision now being reviewed, the California Court of Appeals concluded:
"At English common law prior to 1854, juveniles charged with crimes were either tried as adults with the right to jury trial, or were not tried at all. With Parliament's enactment of the Youthful Offenders Act in that year, juveniles lost their jury trial rights in cases of minor crimes such as petty theft, but retained the right in felonies." 62 Cal.Rptr.3d at 257-58.
The conclusion was largely based upon an earlier California Court of Appeals decision, In re Javier A., 159 Cal.App.3d 913, 206 Cal.Rptr. 386 (1984), in which there was an extensive discussion of English common law relating to the prosecution of juveniles. In Javier A., the California Court of Appeals discussed many proposals considered by the British Parliament (Parliament) during the 1800's relating to establishing a juvenile justice system similar to current American systems. The analysis focuses upon this period because California became a state in 1850. 159 Cal.App.3d at 930, 206 Cal.Rptr. 386. This same time period is relevant to our consideration because the Kansas Constitution Bill of Rights was ratified by the electors in 1859 and became effective in 1861.
The Javier A. court, citing 3 Blackstone, Commentaries on the Laws of England 379 (1780), noted that the "English placed a high value on trial by jury and vigorously resisted attempts to erode its coverage." 159 Cal. App.3d at 931, 206 Cal.Rptr. 386. Although some limitations were placed on the right to a jury trial in 1854 when Parliament enacted the Youthful Offenders Act and restricted the automatic right to a jury trial when a petty offense was charged, more sweeping proposals were routinely rejected, in part because of objections to doing away with or limiting the right to a jury trial when a felony was charged. 159 Cal.App.3d at 933-41, 206 Cal.Rptr. 386. The legislative history and comments of members of Parliament discussed in the Javier A. opinion provide sound support for that court's conclusion that "[d]espite the parens patriae relationship between the English government and its minor citizens, those same minors enjoyed an unequivocal right to jury trial when accused of crime in the law courts." 159 Cal.App.3d at 932, 206 Cal.Rptr. 386.
The Javier A. court also discussed earlier cases in which American courts had concluded that a right to jury trial in juvenile delinquency proceedings did not exist at common law. These decisions are contrary to the conclusions of many English and American scholars whose writings were discussed in Javier A. Also, these contrary authorities often relied upon English cases relating to a transfer of custody from the father because the juvenile had engaged in criminal conduct. The Javier A. court, after an analysis of the English cases and laws, concluded this reliance was misplaced because custody could be changed "only after a juvenile had been convicted of an offense after a trial in the law courts during which he had enjoyed a right to jury trial." 159 Cal.App.3d at 944, 206 Cal.Rptr. 386.
The California Court of Appeals' thorough and extensive discussion of these authorities, which is only briefly touched upon here, is supported by Kansas cases in which we have noted that at common law a person 14 years old or older was deemed presumptively capable of committing a crime. E.g., State v. Williams, 283 Kan. 492, 495, 153 P.3d 520 (2007); State v. Lowe, 238 Kan. 755, 758, 715 P.2d 404 (1986), overruled on other grounds Lowe v. State, 242 Kan. 64, 744 P.2d 856 (1987). Although these cases have not discussed the right to a jury trial, they recognize the common-law treatment of these juveniles as part of the adult criminal prosecution system. Other Kansas cases have recognized that under this system, "the right of jury trial [was restricted] to cases which at common law were prosecuted by indictment or information, and these, as is well known, were offenses of the higher grade, while ordinary petty offenses were tried upon a simple complaint." In re Rolfs, 30 Kan. at 762, 1 P. 523.
Based upon these authorities, I would conclude that § 5 of the Kansas Constitution Bill *175 of Rights grants a right to a trial by jury to all juveniles 14 years of age or older who are charged with a felony. Thus, 16-year-old L.M., who was charged with aggravated sexual battery, would be entitled to a trial by jury.
McFARLAND, C.J., dissenting:
I respectfully dissent from the majority's decision holding that changes to the juvenile offender system over the last couple of decades have eroded the protective, rehabilitative features of that system to the point that it has become akin to the adult criminal system and, therefore, juvenile offenders are now constitutionally entitled to a jury trial.
In McKeiver v. Pennsylvania, 403 U.S. 528, 91 S.Ct. 1976, 29 L.Ed.2d 647 (1971), the United States Supreme Court held that the Due Process Clause of the Fourteenth Amendment does not require the states to provide a jury trial in a juvenile offender proceeding. The decision was based on the recognition that the juvenile system is fundamentally different from the adult criminal system in that its focus is rehabilitation, not punishment. This goal is pursued through less formal, more individualized, paternalistic, protective proceedings than those in the adult criminal system. See 403 U.S. at 544 n. 5, 545, 546 n. 6, 547, 91 S.Ct. 1976. Interjecting the right to a jury trial into the juvenile system would impair the "assumed ability [of the juvenile court] to function in a unique manner" (403 U.S. at 547, 91 S.Ct. 1976) and "bring with it into that system the traditional delay, the formality, and the clamor of the adversary system and, possibly, the public trial" (403 U.S. at 550, 91 S.Ct. 1976), without bringing any significant improvement to the fact-finding process. (403 U.S. at 547, 91 S.Ct. 1976).
Thirteen years after McKeiver, the newly enacted Kansas Juvenile Offenders Code was the subject of a challenge similar to the one presently before the court. In In re Findlay, 235 Kan. 462, 681 P.2d 20 (1984), it was argued that juveniles charged with acts that would constitute a felony if committed by an adult were tried under a process essentially equivalent to an adult criminal trial and, thus, the constitutional right to trial by jury should apply. Noting that the policy of the Kansas Juvenile Offenders Code was still consistent with the rationale underlying the McKeiver decision, we held that juvenile proceedings are not the equivalent of criminal trials and, therefore, juveniles do not have a federal or state Constitutional right to trial by jury in juvenile offender proceedings. Findlay, 235 Kan. at 465-66, 681 P.2d 20.
The majority acknowledges this precedent, but holds that the benevolent, protective, parens patriae characteristics of the juvenile system that the United States Supreme Court relied on in McKeiver to distinguish it from adult criminal prosecutions have been so eroded by legislative changes over the years that the current system is more geared toward prosecuting and punishing juveniles in a manner akin to the adult criminal system. Thus, the rationale underlying McKeiver and Findlay no longer applies and juveniles therefore must be afforded the right to trial by jury under the Sixth and Fourteenth Amendments to the United States Constitution and under § 10 of the Kansas Constitution Bill of Rights.
I disagree. Although it cannot be disputed that in the 20-plus years since Findlay, the juvenile system has become more punitive and has incorporated some of the terminology and mechanisms of the adult criminal system, the majority overstates and overemphasizes the changes while ignoring the many features of the current system that remain consistent with the benevolent, protective, rehabilitative, child-cognizant characteristics that distinguish the juvenile system from the criminal system. The protective, rehabilitative focus that has distinguished the juvenile system from the punitive, retributive adult criminal system is still very much alive.
Discussion
The majority contends that the current juvenile system has changed to be more in line with the adult criminal system in four ways: (1) the policy goals of the juvenile system have shifted from rehabilitation to protection of the public and accountability, goals more akin to those underlying the criminal system; (2) the current juvenile code uses language similar to that used in *176 the criminal codes; (3) juveniles are now subject to determinative sentencing that closely resembles the sentencing guidelines for adults, and the sentencing options available for juvenile offenders are analogous to those available in the adult sentencing system; and (4) some of the protective confidentiality features of the former juvenile system have been eliminated.
The Policy Goals
First, the majority points to changes in the policy goals of the juvenile system, as stated in K.S.A.1982 Supp. 38-1601 and K.S.A.2006 Supp. 38-2301. The majority contends the amendments in the stated goals evidence a shift from rehabilitation and the State's parental role in providing care, custody, guidance, control, and discipline to protecting the public, holding juveniles accountable, and making juveniles more productive and responsible members of society. What the majority disregards, however, is that in 1982, protection of the public, along with rehabilitation, was an express goal of the juvenile system. K.S.A.1982 Supp. 38-1601 stated:
"K.S.A.1982 Supp. 38-1601 through 38-1685 shall be known and may be cited as the Kansas juvenile offenders code and shall be liberally construed to the end that each juvenile coming within its provisions shall receive the care, custody, guidance, control and discipline, preferably in the juvenile's own home, as will best serve the juvenile's rehabilitation and the protection of society. In no case shall any order, judgment or decree of the district court, in any proceedings under the provisions of this code, be deemed or held to import a criminal act on the part of any juvenile; but all proceedings, orders, judgments and decrees shall be deemed to have been taken and done in the exercise of the parental power of the state." (Emphasis added.)
Similarly, protection of the public and rehabilitation remain primary goals of the juvenile justice system:
"This act shall be known and may be cited as the revised Kansas juvenile justice code. The primary goals of the juvenile justice code are to promote public safety, hold juvenile offenders accountable for their behavior and improve their ability to live more productively and responsibly in the community. To accomplish these goals, juvenile justice policies developed pursuant to the revised Kansas juvenile justice code shall be designed to: (a) Protect public safety; (b) recognize that the ultimate solutions to juvenile crime lie in the strengthening of families and educational institutions, the involvement of the community and the implementation of effective prevention and early intervention programs; (c) be community based to the greatest extent possible; (d) be family centered when appropriate; (e) facilitate efficient and effective cooperation, coordination and collaboration among agencies of the local, state and federal government; (f) be outcome based, allowing for the effective and accurate assessment of program performance; (g) be cost-effectively implemented and administered to utilize resources wisely; (h) encourage the recruitment and retention of well-qualified, highly trained professionals to staff all components of the system; (i) appropriately reflect community norms and public priorities; and (j) encourage public and private partnerships to address community risk factors." (Emphasis added.) K.S.A.2006 Supp. 38-2301.
Although the new statute is much more specific about how its goals will be accomplished, the basic goals of protecting the public and rehabilitating juvenile offenders, i.e., improving the ability of juveniles to live more productively and responsibly in the community, remain consistent.
Moreover, contrary to the majority's contention, these goals are nothing like those set out in the adult sentencing guidelines in K.S.A. 21-4601:
"This article shall be liberally construed to the end that persons convicted of crime shall be dealt with in accordance with their individual characteristics, circumstances, needs, and potentialities as revealed by case studies; that dangerous offenders shall be correctively treated in custody for long terms as needed; and that other offenders shall be dealt with by probation, suspended sentence, fine or assignment to *177 a community correctional services program whenever such disposition appears practicable and not detrimental to the needs of public safety and the welfare of the offender, or shall be committed for at least a minimum term within the limits provided by law."
That statute makes it clear that in the adult sentencing system, the focus is on the protection of the public through long terms of confinement for dangerous offenders, with imposition of lesser sanctions only where consistent with public safety and the welfare of the offender. There is no language suggesting that rehabilitation is one of the goals of the adult sentencing system.
Language
The majority concludes that the current juvenile code incorporates language similar to that found in the adult system, thus stressing the similarities between juvenile and adult offenders over their differences. For example, in 1982 juveniles admitted or denied the allegations against them, while now they must plead guilty or not guilty. Compare K.S.A.1982 Supp. 38-1633(b) with K.S.A.2006 Supp. 38-2344(b). The "dispositional proceeding" is now a sentencing proceeding. Compare K.S.A.1982 Supp. 38-1605 with K.S.A.2006 Supp. 38-2361. The "state youth center" is now called a "juvenile correctional facility." Compare K.S.A.1982 Supp. 38-1602(g) with K.S.A.2006 Supp. 38-2302(j). Juveniles are now committed to a juvenile correctional facility for a term of incarceration. K.S.A.2006 Supp. 38-2376.
Clearly some of the terminology has changed. And labels are important to some extent  hence the retention of the term adjudication instead of the term conviction (K.S.A.2006 Supp. 38-2356). Nevertheless, form must not be placed over substance. If a change in terminology does not reflect any substantive change in the thing or process described, then too much emphasis should not be placed on that terminology. The facilities denominated as state youth centers, and now juvenile correctional facilities, are one and the same. See K.S.A. 76-2101 (Youth Center at Topeka renamed Topeka Juvenile Correctional Facility); K.S.A. 76-2101b (Youth Center at Atchison renamed Atchison Juvenile Correctional Facility); K.S.A. 76-2201 (Youth Center at Beloit renamed the Beloit Juvenile Correctional Facility); and K.S.A. 76-3204 (Youth Center at Larned renamed Larned Juvenile Correctional Facility). Regardless of their names, these facilities have always been institutions where juvenile offenders are sent to serve a period of court-ordered confinement.
Sentencing
The majority contends that the sentencing scheme and the options available are now more like those in the adult criminal system. Specifically, the majority notes that juveniles now have determinate presumptive sentencing under a matrix that is based on the offense committed and the juvenile's unique adjudicatory history. See K.S.A.2006 Supp. 38-2369. And, the majority notes that, like the adult sentencing scheme under the guidelines grid, the current code allows the juvenile judge to depart upward from the presumptive matrix upon finding that substantial and compelling reasons support departure. In determining whether to depart, the court may consider the nonexclusive list of aggravating factors set forth in the adult guidelines. K.S.A.2006 Supp. 38-2371.
Significant differences remain between the two systems that are overlooked by the majority. First, the majority's analysis fails to take into account the difference in the severity of the sentences juveniles face under the matrix for the same crime committed by an adult offender. For example, a juvenile adjudicated for an offense which if committed by an adult would be classified as a nondrug severity level 1 felony offense, would face a minimum term of 24 months and a maximum term that could not extend beyond the juvenile reaching the age of 22 years, 6 months. K.S.A.2006 Supp. 38-2371(a)(2), (d)(3). An adult with no criminal history convicted of a nondrug severity level 1 felony would face a minimum term of 147 months and a maximum term of 165 months. K.S.A. 21-4704. The KJJC also does not allow imposition of consecutive sentences. In re W.H., 274 Kan. 813, 823, 57 P.3d 1 (2002). Additionally, the maximum term of commitment of any juvenile *178 to a juvenile correctional facility is age 22 years, 6 months. K.S.A.2006 Supp. 38-2371(d)(3).
Second, in contrast to the adult sentencing guidelines, the sentences provided under the juvenile sentencing matrix are not mandatory. Commitment to a juvenile correctional facility for a term under the matrix is only one of a number of sentencing alternatives available to a juvenile judge. K.S.A.2006 Supp. 38-2361(a). Thus, the judge has discretion in deciding whether to sentence a juvenile to a juvenile correctional facility. If that option is chosen, however, the court must impose the applicable sentence specified in the matrix. While the court may depart upward, downward departures are not authorized, presumably because a commitment to a juvenile correctional facility is discretionary in the first instance. K.S.A. 2006 Supp. 38-2369(a); K.S.A.2006 Supp. 38-2371(d)(2), (3).
Another compelling difference is the power given to the juvenile judge to modify the sentence after it has been imposed  a power that does not exist under the adult sentencing guidelines. See State v. Anthony, 274 Kan. 998, 999, 58 P.3d 742 (2002) (noting that the Kansas Sentencing Guidelines Act eliminated the discretionary power to modify a lawful sentence once imposed); but see K.S.A. 22-3716(b) (upon probation revocation, court may require the defendant to serve the sentence imposed or any lesser sentence).
K.S.A.2006 Supp. 38-2367(d) provides that "[a]ny time within 60 days after a court has committed a juvenile offender to a juvenile correctional facility the court may modify the sentence and enter any other sentence[.]" Under K.S.A.2006 Supp. 38-2367(e), the court may, upon motion by the commissioner, modify the sentence if the court determines: "(1) The medical condition of the juvenile justifies a reduction in sentence; or (2) the juvenile's exceptional adjustment and rehabilitation merit a reduction in sentence."
The discretionary sentencing provisions and the modification provisions are unique to the juvenile system and are a clear expression of the legislature's continued belief in the juvenile system as an individualized, protective, and rehabilitative process.
Additionally, the majority notes that the current juvenile code imposes a term of aftercare on juveniles sentenced to a term of confinement under the matrix. This, the majority contends, reflects the adult sentencing guidelines postrelease provisions. A postrelease period of supervision is not new to the juvenile system. In 1982, the code required a period of conditional release for juvenile offenders who had completed a period of confinement at a state youth center. K.S.A. 1982 Supp. 38-1673. Under the KJOC, the period of conditional release was determined by the youth center superintendent, while now, the sentencing matrix provides specified periods of aftercare. Compare K.S.A.1982 Supp. 38-1673 with K.S.A.2006 Supp. 38-2369.
The majority also mentions that the KJJC now provides the opportunity for good time credits, just like the adult system. I fail to see how providing a benefit to juveniles  even if it is the same benefit provided to incarcerated adult offenders  is really relevant to the issue of whether the new juvenile system is no longer the individualized, protective, rehabilitative system that it was when Findlay was decided. How would denying juveniles good time credits better serve a benevolent, paternalistic purpose?
The majority also fails to consider the importance of extended jurisdiction juvenile prosecution under K.S.A.2006 Supp. 38-2347. Extended jurisdiction juvenile prosecution became effective in 1997 (see L.1996, ch. 229, sec. 67), and is a mechanism whereby serious or repeat juvenile offenders who might otherwise have been waived up to adult court may remain in the juvenile sentencing system. In an extended jurisdiction juvenile prosecution, the court imposes both a juvenile and an adult sentence. The adult sentence is stayed as long as the juvenile complies with and completes the conditions of the juvenile sentence. If, however, the juvenile violates the conditions of the juvenile sentence, the juvenile sentence is revoked, the adult sentence is imposed, and the juvenile court transfers jurisdiction of the case to adult court. K.S.A. 2006 Supp. 38-2347(f); K.S.A.2006 Supp. 38-2364. *179 Because a juvenile in an extended jurisdiction prosecution may end up in adult court with an adult sentence, the right to trial by jury is provided by statute. K.S.A. 2006 Supp. 38-2347(f)(4). Extended jurisdiction juvenile prosecution is important to the issue at hand because it evidences a last-ditch effort to extend the favorable protections of juvenile court and the benefits of its less severe sentences to juvenile offenders who previously would have been waived to adult court.
Sentencing options
The majority contends that the sentencing options available to the juvenile judge are much more akin to those available for adult offenders. The court notes that juvenile offenders, like adult offenders, may be sentenced to probation; a community-based program; house arrest; a sanctions house, which the majority likens to conservation camps; placement in an out-of-home facility; and incarceration. In addition, the court may order both adults and juveniles to attend counseling; drug and alcohol evaluations; mediation; and educational programs. The court may also order both juveniles and adults to perform charitable or community service, pay restitution, and pay fines.
This broad overview overlooks the many unique features of the juvenile system that emphasize family and community involvement, early intervention diversionary procedures, flexibility to accommodate individualized needs of juveniles upon intake into the system, preference for noncustodial placements, graduated sanctions with preferences for the least-restrictive alternatives, and, above all, rehabilitation.
The juvenile system has unique pre-charge intake and intervention procedures: the Juvenile Intake and Assessment Program and the intermediate intervention program. Under the Juvenile Intake and Assessment Program, a juvenile taken into custody by law enforcement is taken to a local juvenile intake and assessment program for evaluation. K.S.A.2006 Supp. 38-2330(d)(1); K.S.A.2006 Supp. 75-7023(c). The program is operational in all 31 judicial districts, and juvenile intake and assessment centers are open 24 hours a day, 7 days a week. The intake and assessment worker administers assessments and gathers information about the juvenile, including criminal history, abuse history, history of substance abuse, educational history, and family history. After completing the assessment process, the intake and assessment worker has several options. The worker may release the juvenile to a parent or parents, or other legal guardian or appropriate adult, with or without conditions, if the worker believes that is in the child's best interests. The conditions may include counseling for the juvenile and/or the child's family, participation by the juvenile, family members and other relevant persons in mediation, inpatient treatment, and referral to available community services. K.S.A.2006 Supp. 75-7023(e)(1),(2). The worker may also refer the juvenile to the county or district attorney for the filing of charges and make recommendations concerning intermediate intervention programs that may be beneficial for the juvenile. K.S.A.2006 Supp. 75-7023(e)(4), (5).
A juvenile may be taken directly to a juvenile detention facility rather than an intake and assessment program if specific criteria apply, including: the juvenile is a fugitive, has escaped from a juvenile detention facility, or has absconded from an ordered placement; the juvenile is alleged to have committed a sex offense; the juvenile has a history of violent behavior or a prior adjudication for a felony offense. K.S.A.2006 Supp. 38-2331(b). However, before taking the juvenile to a detention facility, the officer must first consider whether taking the juvenile to a nonsecure facility is more appropriate. K.S.A.2006 Supp. 38-2330(d)(1).
The immediate intervention program is also unique to the juvenile code. It is a diversionary program designed to allow juveniles to avoid prosecution but, unlike adult diversion, is available even before charges are filed. Compare K.S.A.2006 Supp. 38-2346(a) with K.S.A. 22-2907(1). In addition, the immediate intervention program statute authorizes the establishment of local programs which provide for intake and assessment workers or county or district attorneys to refer cases directly to youth courts, restorative *180 justice centers, hearing officers, or other local programs sanctioned by the court. K.S.A.2006 Supp. 38-2346(a).
The importance of these unique intake and intervention procedures to the issue at hand cannot be dismissed. As Justice White noted in McKeiver: "To the extent that the jury is a buffer to the corrupt or overzealous prosecutor in the criminal law system, the distinctive intake policies and procedures of the juvenile court system to a great extent obviate this important function of the jury." McKeiver, 403 U.S. at 552, 91 S.Ct. 1976 (White, J., concurring).
A dispositional feature unique to the juvenile system is its preference for maintaining the family unit. Under the KJJC, the court must make specific findings that reasonable efforts were made to maintain the family unit or that an emergency exists before a juvenile may be removed from the home, whether for detention, placement in the custody of the commissioner, or commitment to a juvenile correctional facility. An order removing a juvenile from the home may be made if the juvenile presents a risk to public safety. See K.S.A.2006 Supp. 38-2331; K.S.A.2006 Supp. 38-2334(a); K.S.A.2006 Supp. 38-2335(a), (c); K.S.A.2006 Supp. 38-2343(e).
It appears the legislature required these findings in an effort to comply with the provisions of the federal Adoption and Safe Families Act of 1997 (42 U.S.C. §§ 670 et seq. [2007]) (ASFA) See Minutes, Joint Committee on Children's Issues, November 16, 2006. However, it must be noted that this statutory preference for maintaining the family unit is consistent with the policy stated in K.S.A. 1982 Supp. 38-1601: "[The code] shall be liberally construed to the end that each juvenile coming within its provisions shall receive the care, custody, guidance, control and discipline, preferably in the juvenile's own home, as will best serve the juvenile's rehabilitation and the protection of society."
In line with this emphasis on maintaining the family unit, the KJJC also requires that when a juvenile is placed out of the home, a permanency plan must be prepared which provides for reintegration or, if reintegration is not a viable option, for some other permanent placement. K.S.A.2006 Supp. 38-2365(b), (c). The court must conduct a review every 6 months of the progress being made toward permanency. K.S.A.2006 Supp. 38-2365(d).
Another significant difference between the adult system and the juvenile system is the court-appointed special advocate (CASA). In 1994, the legislature provided for the appointment of a CASA  formerly a feature unique to child in need of care cases  in juvenile offender cases. L.1994, ch. 282, sec. 9; K.S.A.2006 Supp. 38-2307. The CASA's primary duty is to advocate for the juvenile's bests interests. K.S.A.2006 Supp. 38-2307(a).
The addition of local citizen review boards to the juvenile process is also a feature not found in the adult criminal system. Under K.S.A.2006 Supp. 38-2308(a), judges may refer juvenile offender cases to the local citizen review board for the purpose of determining the progress that has been made toward rehabilitation and making recommendations regarding further actions on the case.
Additionally, and most importantly, the KJJC not only emphasizes, but requires, parental involvement in the entire process. Intake and assessment workers may require parents to participate in programs and services as a condition of the juvenile's release back home. K.S.A.2006 Supp. 75-7023(e)(2). The county or district attorney is authorized to require parents to be a part of any immediate intervention program. K.S.A.2006 Supp. 38-2346(d). Parents served with a summons are required to attend all proceedings involving the juvenile unless excused by the court. K.S.A.2006 Supp. 38-2351. The court has the power to require parents to participate in counseling, mediation, alcohol and drug evaluations and treatment programs, and parenting classes. K.S.A.2006 Supp. 38-2362. The court also has the power to order parents to report violations of conditions of probation or conditional release and may order them to aid the court in enforcing the court's orders. Violation may result in contempt sanctions. K.S.A.2006 Supp. 38-2363.
This emphasis on parental involvement is not merely incidental to the fact the juvenile *181 offender is a child, but is, instead, part of the family and community centered approach to juvenile rehabilitation. As the Oregon Supreme Court found when it rejected the argument that the Oregon juvenile system had become so akin to the adult system that juveniles should be afforded the right to jury trial:
"Coupled with the juvenile code's focus on the best interests and welfare of the child, this policy of parental involvement in the rehabilitation of children distinguishes a delinquency proceeding from an adult criminal prosecution for purposes of Article I, section 11. The message of the juvenile code is clear and unequivocal-rehabilitation of children in trouble is a family affair. In no way is the adult criminal justice system comparable to that model." State ex rel. Juv. Dept. v. Reynolds, 317 Or. 560, 573-74, 857 P.2d 842(1993).
Confidentiality and other protective provisions
The majority also contends that juvenile proceedings and records no longer have the confidentiality protections they did in 1982. The majority points to provisions concerning public access to juvenile court hearings and confidentiality of records. With respect to juvenile hearings, there is little practical difference between the KJOC provisions in 1982 and the current KJJC provisions. The KJOC required that juvenile court hearings be open to the public if the juvenile was 16 years of age or older at the time of the alleged offense. For a juvenile under age 16, the court had discretion to close the hearing. K.S.A.1982 Supp. 38-1652(a). Under the current KJJC, all hearings are open to the public, but in the case of juveniles under the age of 16, the court has discretion to close the hearing. K.S.A.2006 Supp. 38-2353(a), (b).
With respect to confidentiality of juvenile records, there are only two differences between the KJOC and the KJJC. First, the age of protection was lowered from 15 to 13. In 1982, the official court file and law enforcement and municipal court records of juveniles who were under the age of 16 at the time of the alleged offense were protected from public disclosure. In 2006, the law provides that the court may protect the official court file of juveniles who were the under age 14 at the time of the alleged offense. Law enforcement and municipal court records for juveniles who were under age 14 are protected. Compare K.S.A.1982 Supp. 38-1607 (official court file) and K.S.A.1982 Supp. 38-1608 (law enforcement and municipal court records) with K.S.A.2006 Supp. 38-2309 (official court file) and K.S.A.2006 Supp. 38-2310 (law enforcement and municipal court records).
Second, with respect to the official court file only, the file is now open for public inspection unless, in the case of a juvenile who is under age 14, the judge determines that public inspection is not in the juvenile's best interests. K.S.A.2006 Supp. 38-2309(b). Previously, the official file of a juvenile under the age of 16 was privileged and not subject to disclosure to anyone other than the court, the parties and their attorneys, an agency or institution with custody of the juvenile, law enforcement, or upon court order. K.S.A. 1982 Supp. 38-1607(a).
The changes to the juvenile code cited by the majority have not so eroded the features of the juvenile system that distinguish it from the adult system that it can be said that the rationale underlying McKeiver and Findlay is no longer valid. The new system continues to further the goals that have always characterized the modern juvenile system: protection of the public and rehabilitation. As the Criminal Justice Coordinating Council's Juvenile Task Force noted in its report to the legislature in 1995, these two goals are not incompatible. See Koch Crime Commission, General Counsel Division, Juvenile Justice Research Project Results, p. 10 (April 1996) (stating that the Report on Juvenile Offenders submitted to the Kansas Legislature in March 1995 by the Kansas Criminal Justice Coordinating Council's Juvenile Justice Task Force noted that protection of the public and rehabilitation are not incompatible goals). Given the fact that the juvenile system must deal with serious, violent, and habitual offenders, it is entirely appropriate that the juvenile system balance rehabilitation with protection of the public:

*182 "`The juvenile court is a court of law, charged like other agencies of criminal justice with protecting the community against threatening conduct. Rehabilitating offenders through individualized handling is one way of providing protection, and appropriately the primary way in dealing with children. But the guiding consideration for a court of law that deals with threatening conduct is nonetheless protection of the community. The juvenile court, like other courts, is therefore obliged to employ all the means at hand, not excluding incapacitation, for achieving that protection. What should distinguish the juvenile from the criminal courts is greater emphasis on rehabilitation, not exclusive preoccupation with it.'" McKeiver, 403 U.S. at 546, n. 6, 91 S.Ct. 1976 (quoting President's Commission on Law Enforcement and Administration of Justice, Task Force Report: Juvenile Delinquency and Youth Crime, p. 9 [1967]).
The incorporation of certain aspects of the adult sentencing scheme for the most violent and chronic juvenile offenders is a critical part of meeting the obligation to protect the community from these offenders. However, the legislature, in choosing to make sentencing under the matrix a discretionary sentencing option, kept in place the individualized sentencing flexibility that has always been characteristic of the juvenile system. In addition, in creating extended juvenile jurisdiction, the legislature extended the protective net of the juvenile system as a last-ditch effort for those juveniles who would otherwise be prosecuted and sentenced as adults. These key features demonstrate the legislature's effort to carefully balance protection of the public with the goal of rehabilitating youthful offenders.
The dual goals of the juvenile system that commanded its process in 1982 are very much alive and well. The juvenile system still retains significant individualized, protective, rehabilitative, child-cognizant features that distinguish it from the adult system and which allow it to operate toward achieving those goals.
I must also note that the majority's decision is contrary to the weight of authority. The argument the majority accepts in this case has been rejected by the overwhelming majority of courts that have considered it. See Valdez v. State, 33 Ark.App. 94, 801 S.W.2d 659 (1991) (rejecting argument that 1989 revisions to juvenile code made it the same as a criminal prosecution, thus requiring jury trial); In re Myresheia W., 61 Cal. App.4th 734, 72 Cal.Rptr.2d 65 (1998) (changes which allow certain juvenile adjudications to count under the adult "three strikes" law did not so alter nature of juvenile system as to require jury trials); State ex rel. D.J., 817 So.2d 26 (La.2002) (rejecting argument that the analysis supporting the decision in McKeiver has been undermined by recent revisions to the juvenile system that make it more akin to adult criminal justice system); State v. Gleason, 404 A.2d 573, 581 (Me.1979) (revisions to juvenile code retained informality, flexibility of dispositional alternatives, and criteria for selection of proper disposition which distinguish juvenile system from adult system); State v. Chavez, 163 Wash.2d 262, 180 P.3d 1250 (2008) (rejecting argument that the juvenile charged with serious violent offenses faces process and consequences so akin to adult system that right to jury trial should be required); State v. Schaaf, 109 Wash.2d 1, 743 P.2d 240 (1987) (holding that more recent revisions to the juvenile system have not so transformed it into a criminal prosecution that the right to trial by jury must be afforded); State v. Lawley, 91 Wash.2d 654, 591 P.2d 772 (1979) (rejecting argument that revisions to juvenile system rendered it sufficiently comparable to adult system to require right to jury trial).
A contrary result was reached by the Onondaga County Family Court in New York in Matter of Felder, 93 Misc.2d 369, 402 N.Y.S.2d 528 (1978). There, the court faced the issue of whether the current system was "a juvenile proceeding within the meaning of McKeiver, or, whether so many of the attributes of a juvenile proceeding have been discarded that the proceeding is in effect `criminal' in nature and thus [subject to the right to trial by jury]." Felder, 93 Misc.2d at 371, 402 N.Y.S.2d 528. The court held recent juvenile code revisions, and most particularly the provisions mandating specific periods of *183 confinement for certain serious felonies, coupled with the elimination of the court's power to modify that placement if rehabilitation has occurred, transformed the juvenile process into a criminal prosecution and, thus, the right to trial by jury is required. 93 Misc.2d at 381-82, 402 N.Y.S.2d 528.
The majority does not cite Felder. Nevertheless, as the lone post-McKeiver case addressing the same argument made in this case, it is distinguishable. Unlike the New York system, the KJJC does not mandate set periods of confinement, and it specifically provides the court with the power to modify a sentence committing a juvenile to a juvenile correctional facility. K.S.A.2006 Supp. 38-2367. Additionally, another New York court reached the opposite result. See Mtr. of David J., 70 App.Div.2d 276, 421 N.Y.S.2d 411 (1979) (restrictive placement requiring minimum term of confinement did not render juvenile proceeding so akin to adult system that right to jury trial was required).
With no persuasive authority from other jurisdictions, and a less than comprehensive analysis of the current system, the majority concludes that the Kansas juvenile justice system is the essential equivalent of the adult criminal justice system and, thus, the right to trial by jury must be afforded. To what end? As the United States Supreme Court recognized in McKeiver, imposing the constitutional right to trial by jury on the juvenile court system would not greatly strengthen the fact-finding function, but would erode the juvenile court's ability to function in a unique manner, and "remake the juvenile proceeding into a fully adversary process and . . . put an effective end to what has been the idealistic prospect of an intimate, informal protective proceeding." McKeiver, 403 U.S. at 545, 547, 91 S.Ct. 1976. "If the formalities of the criminal adjudicative system are to be superimposed upon the juvenile court system, there is little need for its separate existence." McKeiver, 403 U.S. at 551, 91 S.Ct. 1976.
The experiment has not failed. The majority has overlooked the most significant features of the juvenile system that distinguish it from the adult systemfeatures that promote protection of the public while not only preserving, but furthering, the individualized, protective, rehabilitative character unique to the juvenile system. To quote the Washington Supreme Court, the KJJA "`has not utterly abandoned the rehabilitative ideal which impelled the juvenile justice system for decades. It does not embrace a purely punitive or retributive philosophy. Instead, it attempts to tread an equatorial line somewhere midway between the poles of rehabilitation and retribution.'" Schaaf, 109 Wash.2d at 10, 743 P.2d 240 (quoting State v. Rice, 98 Wash.2d 384, 393, 655 P.2d 1145 [1982]).
For these reasons, I dissent.
NOTES
[1] REPORTER'S NOTE: Judge Richard D. Greene, of the Kansas Court of Appeals, was appointed to hear case No. 96,197 vice Justice Davis pursuant to the authority vested in the Supreme Court by K.S.A. 20-3002(c). Senior Judge Edward Larson was appointed to hear the same case vice Justice Johnson pursuant to the authority vested in the Supreme Court by K.S.A. 20-2616.