IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 114,834

In the Matter of A.D.T.

SYLLABUS BY THE COURT

1.

In an extended juvenile jurisdiction proceeding, the district court imposes one or more juvenile sentences listed in K.S.A. 2015 Supp. 38-2361(a) and an adult criminal sentence.

2.

The adult sentence in an extended juvenile jurisdiction proceeding shall be stayed on the condition that the juvenile offender not violate the provisions of the juvenile sentence and not commit a new offense.

3.

In an extended juvenile jurisdiction proceeding, a juvenile violates the provisions of his or her juvenile sentence by violating the terms of conditional release. The consequences of a juvenile violating the provisions of his or her conditional release in an extended juvenile jurisdiction proceeding are set forth in K.S.A. 2015 Supp. 38-2364(b).

4.

Under K.S.A. 2015 Supp. 38-2364(b), a district court has the authority to revoke the stay of the adult sentence in an extended juvenile jurisdiction proceeding, without prior notice to the juvenile or the juvenile's attorney of record, when it appears that the juvenile has violated the conditions of his or her conditional release. If the juvenile

1

challenges the reasons for revocation, a hearing is required on whether a preponderance of the evidence establishes the violation.

5.

If a district court finds by a preponderance of the evidence that a juvenile on conditional release in an extended juvenile jurisdiction proceeding has violated the conditions of release, K.S.A. 2015 Supp. 38-2364(b) requires the termination of juvenile court jurisdiction and the mandatory execution of the adult sentence, unless the State and the defense agree to modify that sentence.

6.

An appellate court cannot invalidate a statute, otherwise constitutional, just because the members of the court might consider the provisions of the law to be unwise, unfair, and/or unjust.

Appeal from Wyandotte District Court; DELIA M. YORK, judge. Opinion filed June 2, 2017. Affirmed.

*Debera A. Erickson*, of Kansas City, argued the cause and was on the brief for appellant.

*Mollie R. Hill*, assistant district attorney, argued the cause, and *Jerome A. Gorman*, district attorney, was with her on the brief for appellee.

The opinion of the court was delivered by

JOHNSON, J.: In an extended juvenile jurisdiction prosecution (EJJP), the juvenile, A.D.T., pled guilty to first-degree premediated murder. He completed the incarceration portion of his juvenile sentence and was placed on conditional release. After A.D.T. admitted to violating his conditional release by twice testing positive for drugs, the

2

district court revoked A.D.T.'s juvenile sentence and imposed his adult sentence of life imprisonment. On direct appeal to this court, A.D.T. argues that it was manifestly unjust for the district court to impose his adult sentence for the positive urinalysis (UA) tests because he did not receive the recommended substance abuse treatment while in the juvenile correctional facility and because he did not receive proper notice as to what conduct would cause the court to invoke his adult sentence. Addressing only the issues raised in this direct appeal, we affirm the district court.

FACTUAL AND PROCEDURAL OVERVIEW

In April 2008, the State commenced a proceeding under the Revised Kansas Juvenile Justice Code, K.S.A. 2007 Supp. 38-2301 *et seq*., charging 13-year-old A.D.T. with first-degree premediated murder and criminal possession of a firearm. District Judge Wesley K. Griffin designated the proceedings as an EJJP under K.S.A. 2007 Supp. 38-2347(f)(2).

In November 2009, A.D.T. pleaded guilty to first-degree premediated murder. The district court sentenced A.D.T., as a violent I juvenile offender under K.S.A. 2007 Supp. 38-2369(a)(1)(A), to the juvenile correctional facility until age 22 1/2 years old and a term of aftercare until his 23rd birthday. The court also ordered that A.D.T. undergo a substance abuse evaluation and follow any recommendations. For A.D.T.'s adult sentence, which would be statutorily stayed conditioned upon successful completion of the juvenile sentence, the court ordered a life sentence without the possibility of parole for 25 years.

A.D.T. arrived at the Kansas Juvenile Correctional Complex (KJCC) in December 2009. Because of time already served, A.D.T. was scheduled to be released in July 2013.

KJCC staff completed a program plan and progress report addressing A.D.T.'s substance abuse assessment during his incarceration. A.D.T.'s test results on the Substance Abuse Subtle Screening Inventory (SASSI) indicated a "low probability" for substance abuse or dependence disorder. But because A.D.T. self-reported past drug use and admitted to using drugs during the commission of his crime, the report recommended that A.D.T. be referred to the Pathways substance abuse program. A.D.T. remained on the waiting list for Pathways throughout his juvenile incarceration. The final update in the report clarified, "Due to time constraints, lack of counselors/programming, youth education credits interfering with programming time, and [A.D.T.'s] low [Youth Level of Service (YLS)] scores[,] [A.D.T.] will not complete substance abuse treatment at KJCC before his July 19, 2013[,] release date." The report recommended that A.D.T. attend community support systems such as Narcotics Anonymous (NA) and Alcoholics Anonymous (AA) upon his release and submit to random UA tests. In addition, if A.D.T. was found to be using substances on release, he was to be assessed for substance abuse and follow any outpatient treatment recommendations.

Upon A.D.T.'s release in July 2013, the district court found that A.D.T. had been reintegrated and could be returned home. The permanency plan order noted that the district court's previous orders "shall continue in full force and effect."

That same month, A.D.T. entered into a contract explaining the conditions of his release while under community corrections supervision and the sanctions for any violation. The conditional release contract required A.D.T., *inter alia*, to "refrain from the purchase, possession or consumption of drugs." The contract clarified that if A.D.T. violated the conditions, he could be subjected to internal sanctions or he could be returned to the district court. If A.D.T. was returned to the district court, the contract provided that the district court may (1) impose 2 days in a sanction house for a positive

4

UA test, (2) resentence A.D.T. to a new juvenile disposition, or (3) impose one or more of a combination of sanctions.

On January 23, 2015, A.D.T., now 20 years old, submitted to a UA test that was positive for cocaine. A.D.T.'s intensive supervision officer (ISO), Christy Blagg, sanctioned A.D.T. internally by referring him to Mirror Inc. for a substance abuse assessment.

Mirror Inc. assessed A.D.T. on April 8, 2015. A.D.T reported that he lived in a drug-free home environment, that he did not use drugs or alcohol, and that he tried drugs around the age of 13 but had not used drugs or alcohol in the past 7 years, including the 5 years of his incarceration. A.D.T. denied having used cocaine before, despite his positive UA test. The Mirror Inc. report stated, "It is somewhat difficult to fully determine, but at the same time questionable as to whether or not [A.D.T.] has any drug addiction problems; given that he had spent the majority of his teenage years in a Juvenile Detention Correctional Center." The report concluded, "Based on [American Society of Addiction Medicine, (ASAM)] criteria and with his SASSI test result finding that he has a Low Probability Of Having A Substance Abuse Disorder; this assessor is recommending No Treatment needed at this period of time." The month following his assessment, on May 14, 2015, A.D.T. had a second positive UA test for cocaine.

The matter was referred to the prosecutor's office, which filed a motion with District Judge Griffin seeking to revoke A.D.T.'s juvenile sentence and execute the adult sentence, alleging that A.D.T. violated conditional release by testing positive for cocaine twice. The judge entered an ex parte order finding cause to lift the stay of execution of A.D.T.'s adult sentence. The ex parte order for execution of adult sentence notified A.D.T. of his right to challenge the reasons for the revocation of the stay of execution and

5

his right to a hearing. A.D.T. promptly filed a motion with the judge requesting an evidentiary hearing.

In August 2015, the matter was reassigned to District Judge Delia York, who held an evidentiary hearing in November 2015, at which A.D.T. and ISO Blagg testified. A.D.T. admitted that he had two positive UA tests, but he claimed that after his assessment at Mirror Inc. for the first positive UA, he was told he would be reevaluated for treatment if he had another positive test. A.D.T. acknowledged having discussed with ISO Blagg the consequences of a second positive UA test, but he contended that ISO Blagg never communicated that A.D.T. would have to serve a life sentence. Instead, he claimed, the ISO told him "she didn't know because she never had anybody else on EJJP."

In contrast, ISO Blagg testified that she had told A.D.T. after his first positive UA that she had gone against her colleagues' wishes by asking for a substance abuse assessment, instead of turning the case over to the State for further court proceedings. The ISO explained to A.D.T. that this "was his chance; and if he tested positive again, that we would have to turn it over to the district attorney's office, and we wouldn't have a choice at that time." ISO Blagg related that on four occasions after A.D.T.'s first positive UA, including after his assessment at Mirror Inc., she had told A.D.T. that he was not allowed to use drugs and had discussed the ramifications of his EJJP sentence. The ISO testified that she explicitly told A.D.T. "'[y]ou don't want to do this again, 'cause it'll be twenty-five years of your life.'"

In argument, counsel for A.D.T. conceded that A.D.T. did not dispute that he had two positive UA tests. However, counsel argued that the district court should not revoke A.D.T.'s juvenile sentence because A.D.T. did not receive the treatment at the KJCC that the court-ordered substance abuse evaluation recommended. Counsel asserted that this

6

lack of service "caused detriment" to A.D.T. by not giving him the tools that he needed to not use drugs when released back into the community. Counsel opined that revoking A.D.T.'s EJJP sentence would be "essentially punishing [A.D.T.] for the fact that we didn't give him the services that he should have had while in the correctional facility." Counsel also pointed to A.D.T.'s testimony that he was advised that a second positive UA test would result in a reassessment.

The State responded that A.D.T.'s stipulation to two positive UA tests provided the necessary evidence to revoke A.D.T.'s juvenile sentence. The State also argued that ISO Blagg had warned A.D.T. of the consequences for a conditional release violation and that whether A.D.T. received substance abuse treatment at the KJCC was irrelevant on the question of whether he violated conditional release.

Judge York found, by a preponderance of the evidence, that A.D.T. violated the terms of his signed conditional release contract by failing two drug tests; and that ISO Blagg had made A.D.T. aware of the consequences for a second positive drug test. The judge concluded that the controlling statute, K.S.A. 2015 Supp. 38-2364(b), *required* the revocation of A.D.T.'s juvenile sentence and imposition of his adult sentence upon the court's finding of the conditional release violations. The court observed that the statutes make no exception for technical violations or substance abuse, "even though the court may feel like there should be," and the district court had no choice at that point but to affirm Judge Griffin's revocation of the juvenile sentence and commit A.D.T. to serve his adult sentence.

A.D.T. timely appealed. This court has jurisdiction under K.S.A. 2015 Supp. 22-3601(b) (off-grid crime; maximum sentence of life imprisonment imposed).

7

VIOLATING CONDITIONAL RELEASE IN AN
EXTENDED JURISDICTION JUVENILE PROSECUTION

A.D.T. argues "what has occurred in this case has caused a manifest injustice to his constitutional rights." Specifically, A.D.T. alleges his "rights were violated when he did not receive notice as to what would cause the adult sentence to be implemented and when he did not receive services/treatment ordered by the court when he was a child." The State responds that the district court strictly complied with the provisions of K.S.A. 2015 Supp. 38-2364(b) governing the revocation of A.D.T.'s juvenile sentence and the invocation of his adult sentence.

*Standard of Review/Rules of Statutory Construction*

Before imposing the adult sentence in an EJJP, the district court is statutorily required to find a violation of the conditions of the juvenile sentence by a preponderance of the evidence. See K.S.A. 2015 Supp. 38-2364(b). Because this is a question of fact, this court's review is limited to determining whether substantial competent evidence supports the district court's finding. *In re E.J.D.*, 301 Kan. 790, 794, 348 P.3d 512 (2015). Substantial evidence refers to legal and relevant evidence that a reasonable person could accept as being adequate to support a conclusion. *State v. Talkington*, 301 Kan. 453, 461, 345 P.3d 258 (2015).

Here, the district court also determined that the relevant statutory provisions precluded the exercise of discretion on disposition, once the court found a conditional release violation. Our review of the district court's statutory interpretation is unlimited and de novo. *In re E.J.D.*, 301 Kan. at 792.

In conducting our unlimited review of statutes, we apply certain rules of construction. The most fundamental rule is that the intent of the legislature governs if that intent can be ascertained. *In re E.J.D.*, 301 Kan. at 793. The court first attempts to ascertain legislative intent through the statutory language enacted, giving common words their ordinary meanings. When a statute is plain and unambiguous, we will refrain from reading something into the statute that is not readily found in its words. In other words, where there is no ambiguity, we need not resort to any further statutory construction rules. *In re A.M.M.-H.*, 300 Kan. 532, 535, 331 P.3d 775 (2014).

*Analysis*

In an EJJP proceeding, the district court imposes one or more juvenile sentences listed in K.S.A. 2015 Supp. 38-2361(a) and an adult criminal sentence. The juvenile commences serving the juvenile sentence, and the adult sentence "shall be stayed on the condition that the juvenile offender not violate the provisions of the juvenile sentence and not commit a new offense." K.S.A. 2015 Supp. 38-2364(a)(1)-(2). A juvenile violates the provisions of his or her juvenile sentence by violating the terms of conditional release. *In re A.M.M.-H.*, 300 Kan. at 539. The consequences of violating conditional release are found in K.S.A. 2015 Supp. 38-2364(b). See *In re A.M.M.-H.*, 300 Kan. at 538 (K.S.A. 2015 Supp. 38-2364 applies in cases alleging violations of a conditional release contract in an EJJP). K.S.A. 2015 Supp. 38-2364(b) provides:

> "When it appears that a person sentenced as an extended jurisdiction juvenile has violated one or more conditions of the juvenile sentence or is alleged to have committed a new offense, the court, without notice, may revoke the stay and juvenile sentence and direct that the juvenile offender be immediately taken into custody and delivered to the secretary of corrections pursuant to K.S.A. 2015 Supp. 21-6712, and amendments thereto. The court shall notify the juvenile offender and such juvenile offender's attorney of record, in writing by personal service, as provided in K.S.A. 60-303, and amendments

thereto, or certified mail, return receipt requested, of the reasons alleged to exist for revocation of the stay of execution of the adult sentence. If the juvenile offender challenges the reasons, the court shall hold a hearing on the issue at which the juvenile offender is entitled to be heard and represented by counsel. After the hearing, if the court finds by a preponderance of the evidence that the juvenile committed a new offense or violated one or more conditions of the juvenile's sentence, the court shall revoke the juvenile sentence and order the imposition of the adult sentence previously ordered pursuant to subsection (a)(2) or, upon agreement of the county or district attorney and the juvenile offender's attorney of record, the court may modify the adult sentence previously ordered pursuant to subsection (a)(2). Upon such finding, the juvenile's extended jurisdiction status is terminated, and juvenile court jurisdiction is terminated. The ongoing jurisdiction for any adult sanction, other than the commitment to the department of corrections, is with the adult court. The juvenile offender shall be credited for time served in a juvenile correctional or detention facility on the juvenile sentence as service on any authorized adult sanction."

To paraphrase, K.S.A. 2015 Supp. 38-2364(b) gives the district court the authority to revoke the stay of the adult sentence, without prior notice to the juvenile or the juvenile's attorney of record, when it "appears" based on the allegations in the State's motion to revoke that the juvenile has violated the conditions of conditional release. Once the juvenile is served proper notice that his or her juvenile sentence has been revoked, the district court must hold a hearing *if* the juvenile challenges the reasons for revocation. After such a hearing, if the district court finds by a "preponderance of the evidence" that the juvenile violated the conditions of conditional release, "K.S.A. [2015] Supp. 38-2364(b) requires a mandatory execution of the adult sentence," unless the State and the defense agree to modify that sentence. *In re A.M.M.-H.*, 300 Kan. at 540. At that point, the juvenile court's jurisdiction ends, and "[t]he ongoing jurisdiction for any adult sanction, other than the commitment to the department of corrections, is with the adult court." K.S.A. 2015 Supp. 38-2364(b).

In this case, A.D.T. admitted to testing positive for cocaine on two occasions while on conditional release. His conditional release contract required A.D.T. to "refrain from the purchase, possession or consumption of drugs." Understandably, A.D.T. does not attempt to argue that the evidence was insufficient to support the district court's finding that a preponderance of the evidence established a juvenile sentence violation. Just as obviously, the State did not agree to modify A.D.T.'s sentence after the court's finding of a conditional release violation, and A.D.T. does not contend otherwise.

Statutorily, then, Judge York was correct in opining that she had no discretion to modify Judge Griffin's revocation of A.D.T.'s juvenile sentence, but rather she was required to execute A.D.T.'s adult sentence and transfer jurisdiction to the adult criminal court. In short, the plain and unambiguous language of K.S.A. 2015 Supp. 38-2364(b) mandated the result in this case. See *In re A.M.M.-H.*, 300 Kan. at 540 (under plain language of K.S.A. 2013 Supp. 38-2364, preponderance finding triggers automatic termination of extended jurisdiction of juvenile court and endows adult court with ongoing jurisdiction).

A.D.T. does not propose a different construction of K.S.A. 2015 Supp. 38-2364(b). Likewise, although he makes a cursory mention of constitutional rights, A.D.T. does not present an argument as to how or why any provision of K.S.A. 2015 Supp. 38-2364(b) is unconstitutional. See *State v. Sprague,* 303 Kan. 418, 425, 362 P.3d 828 (2015) (point incidentally raised but not argued or supported with authority is deemed abandoned).

Instead, A.D.T. essentially argues that the application of the statutory provisions in his circumstances created a situation that was so unfair and shocking to the conscience that he should be granted relief on the basis of manifest injustice. He then cites to a number of cases where this court granted relief upon claims of manifest injustice. But all

of those cases are inapposite; none applied the concept of manifest injustice to a nondiscretionary, statutorily required judicial order where the constitutionality of the underlying statute was not being challenged.

On the other hand, we have precedent acknowledging that we cannot invalidate a law, otherwise constitutional, just because the members of this court might consider the provisions of the law to be unwise, unfair, and/or unjust. See, *e.g.*, *State ex rel. Tomasic v. Unified Gov't of Wyandotte County/Kansas City,* 265 Kan. 779, 787-88, 962 P.2d 543 (1998) (propriety, wisdom, necessity, and expedience of legislation exclusively for legislative determination). Moreover, on the claim of unfairness, Judge York explained to A.D.T.: "You got an extra shot. You got an extra bite at the apple. Because Ms. Blagg, if she would have reported that initial cocaine test to the District Attorney's Office, we would have seen that motion to revoke in January."

A.D.T.'s complaint that he did not receive drug treatment while incarcerated in the juvenile facility might well illustrate that an adverse consequence of underfunding the juvenile facility might be the cost of providing a prison bed for the next quarter century. But he does not explain what "right" the juvenile was denied when the drug treatment was not provided, and we are unable to discern how that circumstance can trump the plain language of K.S.A. 2015 Supp. 38-2364(b).

Perhaps we could charitably construe A.D.T.'s brief on appeal as raising a constitutional due process of law issue when it asserts "that the respondents [*sic*] rights were violated when he did not receive notice as to what would cause the adult sentence to be implemented." But the facts do not support that argument. The district court specifically found that ISO Blagg made A.D.T. aware of the consequences for a second positive drug test. In other words, A.D.T. did, in fact, have fair notice and warning that, if he failed another drug test, he was facing a hard 25 life sentence as an adult.

In sum, upon the issues raised in this appeal, we must affirm the district court.

Affirmed.

* * *

ROSEN, J., concurring:  I concur with the court's well-reasoned analysis and the result in this case because I agree that A.D.T. does not present reversible error. However, this case lays to rest any lingering doubt as to whether the evolution of our juvenile justice system has "eroded the benevolent parens patriae character that distinguished it from the adult criminal system." *In re L.M.*, 286 Kan. 460, 469, 186 P.3d 164 (2008). In fact, the extended jurisdiction juvenile prosecution (EJJP), as it functioned in this case, provides less procedural safeguards and places a juvenile offender who violates terms of conditional release in a more punitive posture than an adult offender facing the same allegations.

I write separately to express my concern regarding the constitutionality of the results dictated by the governing statute and the failure to provide A.D.T.'s substance abuse treatment. Because A.D.T. did not raise these arguments, they may not serve as the basis of our resolution in this case. However, I briefly note four areas that I believe deserve comment:  (1) the possibility that the EJJP sentence resulted in an Eighth Amendment violation; (2) the possibility that the failure to provide substance abuse treatment resulted in an Eighth Amendment violation; (3) the possibility that the failure to provide substance abuse treatment resulted in a Fourteenth Amendment violation; and (4) the possibility that the failure to provide substance abuse treatment necessitated reconsideration of A.D.T.'s original sentence.

13

First, I question whether EJJP withstands scrutiny under the Eighth Amendment to our United States Constitution, at least in the case before us. At the time of the original adjudication, the district judge here concluded that the State failed to rebut the presumption of juvenile adjudication and instead ordered EJJP. As we stated in *In re D.D.M.*, 291 Kan. 883, 889, 249 P.3d 5 (2011), the judge's EJJP election "effected a denial of the State's motion for adult prosecution."

Central to my concern is the potential motive behind the district court's decision to deny adult prosecution. Both this court and our United States Supreme Court have refused to uphold certain adult sanctions on juveniles to prevent a violation of the Eighth Amendment with the imposition of cruel and unusual punishment. See *Miller v. Alabama*, 567 U.S. 460, 470, 132 S. Ct. 2455, 183 L. Ed. 2d 407 (2012) (mandatory life without parole sentences for juveniles violates the Eighth Amendment); *Roper v. Simmons*, 543 U.S. 551, 575, 125 S. Ct. 1183, 161 L. Ed. 2d 1 (2005) (Eighth Amendment prohibits death penalty for juveniles); *State v. Dull*, 302 Kan. 32, 61, 351 P.3d 641 (2015), *cert. denied* 136 S. Ct. 1364 (2016) (mandatory lifetime postrelease supervision categorically unconstitutional under Eighth Amendment).

While imprisonment without the possibility of parole, death sentences, and lifetime registration may be appropriate for adult offenders, these sentences are inappropriate for juveniles because the Eight Amendment's prohibition of cruel and unusual punishment requires that "'punishment for crime should be graduated and proportioned' to both the *offender* and the offense." (Emphasis added.) *Miller v. Alabama*, 567 U.S. 460, 469, 132 S. Ct. 2455, 183 L. Ed. 2d 407 (2012). It stands to reason that when a judge declines to impose an adult sentence, he or she may do so for the very same reason that this court and the United States Supreme Court have done so—to prevent the imposition of a sentence that is not proportional to the offender or the offense.

14

Assuming that the denial of adult prosecution here was in fact meant to avoid a sentence that amounted to the cruel and unusual punishment of a 13-year-old offender, I question how the adult sentence suddenly transformed into something constitutional when A.D.T failed a drug test 7 years after the original offense. The original crime did not, in the view of the district court, warrant a life sentence, but a technical violation consisting of a remote, singular, nonviolent, noncriminal act somehow earned A.D.T. the life sentence that was earlier inappropriate.

Of course, it may be the case that the judge denied adult prosecution for other reasons. If so, then the imposition of the adult sentence upon A.D.T.'s violation may withstand constitutional scrutiny under the Eighth Amendment. But I am troubled by the result because that does not appear to be the situation before us. A.D.T. was only 13 at the time of the offense and was under overwhelming peer pressure, characterized by the district judge as being under "the influence of that older girl." The behavior was further fueled by the consumption of a potent cocktail of intoxicating drugs—Ecstasy, alcohol, and marijuana. This "older girl" whom A.D.T. was trying to impress not only supplied these drugs, but also drove A.D.T. to and from the scene of the crime and ultimately concealed the weapon utilized in the shooting. Under these facts, the question of whether the sentence is proportional, especially given the judge's emphasis of the importance of drug and alcohol treatment at A.D.T.'s sentencing, may merit further consideration.

Second, I am concerned that the failure to provide A.D.T. the substance abuse treatment that was ordered by the judge further likens A.D.T.'s life sentence to cruel and unusual punishment. The United States Supreme Court has ruled that, under the Eighth Amendment, incarcerated adults are entitled to care for "serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 103-04, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976). While the Supreme Court has held that detained adults do not have a "fundamental right" to rehabilitative treatments, it has yet to decide whether denying substance abuse treatment

15

constitutes an Eighth Amendment violation, either in the case of an adult or a juvenile. See *Marshall v. United States*, 414 U.S. 417, 421-22, 94 S. Ct. 700, 38 L. Ed. 2d 618 (1974).

Part of the consideration for denying adult prosecution in A.D.T.'s case was the availability of rehabilitative treatments that would attend to A.D.T.'s substance abuse issues. When, through the failures of our juvenile system, A.D.T. never received this treatment, he later triggered his adult sentence by engaging in the very behavior that the treatment was meant to address. Considering the debilitating nature of substance abuse and the parens patriae role of the State, the government may have a responsibility to attend to this serious medical need when it commits a juvenile offender to its custody— especially when a judge denies adult prosecution because the juvenile will benefit from rehabilitation programs in the juvenile system that are specifically designed to meet an express need.

Third, the denial of any substance abuse treatment may also have run afoul of A.D.T.'s due process rights under the Fourteenth Amendment. "At the least, due process requires that the nature and duration of commitment bear some reasonable relation to the purpose for which the individual is committed." *Jackson v. Indiana*, 406 U.S. 715, 738, 92 S. Ct. 1845, 32 L. Ed. 2d 435 (1972).

Before juvenile courts existed, young offenders were often incarcerated among adult populations. Abrams, *Lessons from Juvenile Justice History in the United States*, 2004 J. Inst. Just. Int'l Stud. 7, 8 (2004). With the turn of the nineteenth century came a shift in public opinion regarding these juvenile offenders. Abrams at 12. The country began to regard juveniles as developmentally different than adults and therefore entitled to different treatment when entangled in the legal system. Abrams at 12. The shift resulted in juvenile courts designed to rehabilitate children rather than punish youthful

offenders. Note, *Rights and Rehabilitation in the Juvenile Courts*, 67 Colum. L. Rev. 281, 281 (1967). Today, our Kansas Juvenile Justice Code is built upon the same policy; one of its enumerated goals is to improve the ability of juvenile offenders "to live more productively and responsibly in the community." K.S.A. 2015 Supp. 38-2301. Chief Justice McFarland discussed this policy in her dissent in *In re L.M.*, writing that the "rehabilitative focus that has distinguished the juvenile system from the punitive, retributive adult criminal system" not only exists, but in her opinion, "is still very much alive." 286 Kan. at 479.

It seems that any sentence rendered under this code should therefore, at a minimum, serve a rehabilitative purpose if it is to afford the offender his or her due process rights. In A.D.T.'s case, the judge denied adult prosecution, in part because the juvenile system offered rehabilitative treatment to which A.D.T. would be amenable. The denial of this treatment stripped A.D.T. of his right to a sentence that was reasonably related to its purpose of rehabilitation. Under these circumstances, A.D.T. may have been denied his due process rights.

Finally, I question whether the failure to provide the substance abuse treatment presented new evidence that could serve as the basis for reconsideration of the judge's decision to subject A.D.T. to EJJP. While nothing from the record specifically indicates why the judge chose EJJP instead of juvenile adjudication, we do know that the availability of rehabilitative treatment in the juvenile system factored into the judge's general considerations. It is conceivable that the judge elected EJJP over juvenile adjudication because the adult sentence would work as a deterrent to keep A.D.T. from violating the terms of his juvenile sentence while the rehabilitative programs would ensure that A.D.T. would never actually have to serve that adult sentence. In truth, we cannot know the exact motivations behind the judge's decisions. But we can know that his decision *may* have been different had the judge been afforded the correct

17

information—that A.D.T. would never receive the substance abuse treatment that the judge understood would be part of A.D.T.'s original sentence and rehabilitative plan. In light of the fact that the judge made his decisions based on incorrect facts, perhaps A.D.T. is entitled to some relief.

In closing, I note that our legislature recently made changes to the governing statute that, had they been enacted earlier, would have had great effect on the disposition of this case. The new changes prohibit adult prosecution unless a juvenile is 14 or older, which may also eliminate EJJP for juveniles under 14. K.S.A. 2016 Supp. 38-2347(a)(1). Furthermore, the new EJJP statute makes it more difficult to revoke a juvenile sentence under EJJP—now, the execution of an adult sentence is stayed so long as the juvenile substantially complies with the conditions of the juvenile sentence. K.S.A. 2016 Supp. 38-2364(a)(2). The statute to which A.D.T. was subject allowed a judge to immediately revoke the juvenile sentence upon a single technical violation. K.S.A. 2015 Supp. 38-2364(a)(2). Finally, if the judge concludes that the juvenile failed to substantially comply with juvenile conditions that were ordered under EJJP, the new code allows the judge to reevaluate the original adult sentence before it is imposed, so long as the parties agree with that course of action. K.S.A. 2016 Supp. 38-2364(b).

Thus, under the new statutory scheme, A.D.T. would either have been exempt from the adult sentence in the first place or his juvenile sentence would never have been revoked, since it is unlikely that a couple of dirty UAs would constitute a failure to "substantially comply" with his juvenile conditions. Or, had A.D.T. still been subject to EJJP and the adult sentence, the judge would have had the authority to reconsider the terms of that adult sentence before its imposition.

Perhaps these changes are a result of our legislature's consideration of the very concerns I outline today. Unfortunately, the legislative history does not reveal whether

our legislators amended our code in an effort to ensure adherence to our Constitution. But even if these changes were prompted by very different motivators, the fact that our new statutory scheme makes it unlikely that A.D.T. would now be serving a life sentence offers support for the theory that some kind of injustice has occurred.

For all of these reasons, I concur in the result but question whether this result would stand if challenged under different arguments.